BETHESDA MANAGEMENT SERVICES, INC. ET AL. T/A SNELLING AND SNELLING *v.* DEPARTMENT OF LICENSING AND REGULATION, Division of Labor and Industry

[No. 95, September Term, 1975.]

*Decided January 8, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Stanley R. Jacobs* for appellants.

*Walter Timothy Seidel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Henry R. Wolfe, Assistant Attorney General,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal stems from an order issued by the Maryland Commissioner of Labor and Industry (the commissioner) revoking appellants' licenses to operate as employment agencies. On appeal to the Circuit Court for Montgomery County (Mathias, J.), the order was affirmed. A further appeal was lodged in the Court of Special Appeals, but we granted a writ of certiorari prior to a decision by that court.

The events leading to this appeal originated in November 1973 with the visit of David R. Santucci (Santucci) to appellants' Bethesda office where he was interviewed for prospective employment. The visit resulted in Santucci's employment as a manager-trainee by a company to which he was referred by appellants. On the occasion of his interview at the employment agency by an "employment counsellor," Santucci had been informed that the placement fee would be $665. When Santucci indicated that he lacked the necessary funds, the counsellor suggested that Santucci arrange for a loan from Maryland National Bank (Maryland National), an institution with which appellants had established a working relationship for just such purposes. Indeed, the counsellor furnished Santucci with a loan application form, a truth-in-lending statement and the form for a promissory note.

On November 28, 1973, Santucci executed the loan papers, including the note by which he promised to pay Maryland National the sum of $688.68 in six monthly payments of $114.78 commencing one month thereafter. Subsequently, appellants, in accordance with the discount plan which they had arranged with Maryland National, endorsed the note with recourse.[1] Santucci was advised that a payment book would be forwarded to him and that the check for the loan proceeds would be sent directly to the employment agency.

On February 11, 1974, Maryland National drew a check, earmarked in part for the Santucci loan, and delivered it to the employment agency which deposited it on the following day. Also in February, at a date not specified in the record, the employment counsellor advised Santucci by telephone that he should apply for a loan with his own bank because appellants had not received a check from Maryland National. Accordingly, Santucci went to his bank on February 18 and, aided by his parents' credit, borrowed the

---

1. Under the discount plan, Maryland National charged a "9% add-on to the customer," a "10% flat fee" to appellants to be "deducted from the proceeds of each contract," and a further "10% hold-back on each contract deducted from the proceeds to be put in a reserve account . . . to offset any losses."

necessary sum. Using the proceeds of that second loan, Santucci drew a personal check which he delivered to the employment agency on the 19th. At that time, the counsellor instructed him that if Maryland National should thereafter approve the first loan and send a payment book to Santucci, he was to forward it to the employment agency which would return it to Maryland National together with any check which the bank might have issued in payment of the loan. Approximately two weeks later, Santucci did receive a payment book from Maryland National which he sent to the employment agency.

In the ensuing months, Santucci received a succession of delinquency notices from Maryland National, which he forwarded to the employment counsellor with whom he had dealt at appellants' Bethesda office. It developed that appellants had retained in their own bank account the funds received from Maryland National on Santucci's behalf, allegedly pursuant to an understanding with an officer of the bank whereby Santucci's account would be transferred to and assumed by appellants. Santucci was never informed of this arrangement, however, and Maryland National apparently failed to effect the necessary changes in its records. Ultimately, in October 1974, appellants made the final payment to Maryland National on the Santucci loan, but, in being late with two of the six payments, precipitated Santucci's complaint on September 18, 1974, to the Maryland Department of Licensing and Regulation, Division of Labor and Industry (the department).

Three months later, appellants received a letter from the department which stated that a hearing would be held 20 days thereafter, pursuant to Maryland Code (1957, 1972 Repl. Vol.) Art. 56, §§ 161-170 ("Fee-Charging Employment Agencies"), on the written complaint of Santucci, which recited the above facts in skeletal form.[2] Appellants were advised to "show cause" at the proposed hearing "why any or all of [the three] employment agency licenses [which they

---

2. While the letter purported to enclose a copy of the complaint, appellants now insist that they never received it until the hearing three weeks later.

held] should not be revoked or suspended . . . for violation of the [aforesaid] provisions of Article 56, . . . more particularly section 167 (j)" which, in pertinent part, provides that no employment agency doing business in this State shall "[e]ngage in any . . . conduct, whether of the same or a different nature than specified in this section, which constitutes *fraud or dishonest dealing*." (emphasis added). Simultaneously, the commissioner, professing to act in accordance with the previously mentioned statutory provisions, appointed a "hearing officer" with instructions to conduct the hearing "in conformity with the appropriate provisions of Article 41, Sections 244-256, Annotated Code of Maryland, as amended, titled 'Administrative Procedure Act.' "

When the hearing convened on the scheduled date, counsel for appellants requested at the outset a continuance to produce witnesses, primarily representatives of Maryland National, who were then unavailable, and also complained that the commissioner's lack of subpoena power would result in the denial of a fair hearing, since the bank officials were unwilling to appear voluntarily. The hearing officer denied the requested continuance. Counsel for appellants also challenged the proceeding for lack of any specific charges against them, arguing that the complaint filed by Santucci could be construed as alleging more than one violation, to which the hearing officer responded: "Well, the charge is the complaint." Following presentation of the department's case, which proceeded along the lines indicated by our summary, appellants defended their conduct on the basis of the understanding reached with Maryland National. Their principal witness testified that appellants assumed direct payment of the note installments, rather than return the net proceeds of the loan, because Maryland National had already deducted the "penalty," and "was willing to go along" with the transfer of responsibility. The confusion over late payments, he contended, resulted from "computer" errors on the bank's part.

At the conclusion of the hearing, the record was left open to afford appellants an opportunity to produce evidence

from Maryland National corroborating the agreement which they claimed to have made with it following approval of the Santucci loan. Once again the bank officials refused to appear voluntarily, but directed a letter to appellants' lawyer which contributed little of consequence except for its acknowledgment that "a past due notice" had been inadvertently sent to Santucci, and that the latter's "credit rating [had] not been impaired" by reason of the bank's error. Counsel forwarded the letter to the hearing officer who then prepared a narrative summary of the facts presented to him. This summary, in the form of a report, was submitted to the commissioner, but neither appellants nor their attorney was furnished a copy.

Following receipt of the hearing officer's report, the commissioner issued "Findings of Fact [and] Conclusions of Law." The findings consisted essentially of the facts reported by the hearing officer and were the basis for the commissioner's determination, without further specification, that the agency had violated § 167 (j). As a consequence of this decision, the commissioner ordered that the three licenses held by appellants at their respective locations in Montgomery County be revoked. In affirming, the circuit court limited its ruling to the question whether the commissioner's order was "supported by substantial evidence" and did not pass upon the remaining myriad questions presented there by appellants.

In this Court, appellants advance several grounds for reversal:

1. That the commissioner, not having "heard the evidence," failed to comply with Code (1957, 1971 Repl. Vol.) Art. 41, § 253, in rendering a final decision prior to service upon appellants of proposed findings of fact and conclusions of law, and without affording them an opportunity to present argument to the commissioner.

2. That the notice of the administrative hearing failed to comply with § 251 of Art. 41 because it did not state the "issues involved."

3. That the commissioner lacked the statutory authority to appoint a hearing officer.

4. That the hearing officer erred in denying the requested continuance.

5. That the lack of power in the hearing officer to compel testimony resulted in a denial of due process of law.[3]

6. That § 167 (j) is constitutionally infirm for lack of definite standards.

7. That § 169 (a) of Art. 56, the penalty provision, is also constitutionally defective because it is lacking in adequate standards for imposing the penalty of revocation.

In the unique posture of this case, we need only reach the first contention, but prior to doing so, we shall consider a threshold question presented by appellee. The department contends that this case is moot, and that therefore the appeal should be dismissed, because the licenses ordered to be revoked were issued, as required by § 163 of Art. 56, for only one year, to expire on May 1, 1975. Thus, the department argues, since the revoked licenses would, in any event, long since have expired, the subject of this appeal is no longer a matter in controversy. We disagree.

While the order of revocation was pending on appeal to the circuit court, appellants filed applications for new licenses for the one-year period commencing May 1, 1975. After the commissioner rejected the applications, appellants unsuccessfully sought to compel issuance of the new licenses by a mandatory injunction. Although the record does not specifically disclose the reason for its action, it appears that the circuit court denied the injunctive relief in consequence of its simultaneous decision affirming the revocation of the existing licenses. Further appeal from the denial of injunctive relief was abandoned when it became apparent to appellants that the department would not voluntarily issue new licenses and that the successful prosecution of this appeal was critical to any such eventuality.

In *Hayman v. St. Martin's*, 227 Md. 338, 343, 176 A. 2d 772 (1962), we said that "the doctrine of mootness applies to a

---

**3.** By virtue of chapter 481 of the Laws of 1975, enacting § 168A of Art. 56, the commissioner now has been granted the power to "compel the attendance of witnesses."

situation in which past facts and occurrences have produced a situation in which, without any future action, any judgment or decree the court might enter would be without effect." In short, where it appears that our decision could have no effect on what has occurred, *see Md. Tobacco Grow. v. Md. Tob. Auth.*, 267 Md. 20, 25-26, 296 A. 2d 578 (1972), or the questions before us have become academic or reduced to abstract propositions, *see Lucky Stores v. Bd. of Appeals*, 270 Md. 513, 538, 312 A. 2d 758 (1973); *Area Dev. Corp. v. Free State Plaza*, 254 Md. 269, 271, 254 A. 2d 355 (1969), we will generally regard the case as moot. None of this, however, is true here. The avowed position of the department is that it will issue no more licenses to appellants as long as the commissioner's decision in this case is allowed to stand. Conversely, if it should be ultimately determined that the revocations were unwarranted, and no other cognizable grounds for denial existed, appellants would be entitled to new licenses. If we were to sustain the department's position, the practical effect of our decision might well be to foreclose appellate review at this level. Since licenses are issued for only a one year term, it is unlikely that after revocation of a license by the commissioner the administrative phase, the circuit court proceedings and appellate review could all be completed before the license expired. We think this case presents a real controversy.

Appellants challenge the procedure by which the commissioner issued his revocation order. They maintain that the issuance of the order, based on the report of the hearing officer, without first serving on them the proposed decision with findings of fact and conclusions of law and affording them an opportunity to file exceptions and present argument to the commissioner is a fatal departure from § 253 of Art. 41, which provides:

> "Whenever in a contested case, a majority of the officials of the agency who are to render the final decision have not heard the evidence, the decision, if adverse to a party to the proceeding other than the agency itself shall not be made *until a proposal*

*for decision,* including findings of fact and conclusions of law, *has been served* upon the parties, and an opportunity has been afforded to each party adversely affected *to file exceptions and present argument* to a majority of the officials who are to render the decision, who shall personally consider the whole record or such portions thereof as may be cited by the parties." (emphasis added).

As we have noted, following the conclusion of the proceedings before the hearing officer, appellants were granted an opportunity to produce evidence from the bank of the agreement to transfer the note. Following receipt of the information that the bank personnel would not appear voluntarily, the hearing officer forwarded his summary of the testimony to the commissioner, but did not send a copy to appellants or their attorney. The latter were merely sent the commissioner's revocation order, findings and conclusions; no opportunity to note exceptions or present argument to him was ever made available.

Section 253 requires that a proposed decision be served on the parties and affords an adversely affected party an opportunity to file exceptions and present argument "[w]henever in a contested case, a majority of the officials of the [administrative] agency who are to render the final decision have not *heard the evidence.*" (emphasis added). The state maintains that the decision-makers, the commissioner in this instance, have "heard the evidence" when they have read the record of the hearing, thus satisfying § 253 without the necessity of providing an opportunity for adversely affected parties to present argument.

In *Younkin v. Boltz,* 241 Md. 339, 342, 216 A. 2d 714 (1966), we adhered to the general rule "that in the absence of specific statutory direction to the contrary the deciding member or members of an administrative or quasi-judicial agency need not hear the witnesses testify." Section 253, we suggested, contemplates that in a contested case, the evidence will not be heard by all those who will render the decision. *Id.* at 344. The department relies upon *Younkin* to

support its position here, but we think this argument is wide of the mark. While the commissioner may have been free to decide the case without attending the hearing and actually listening to the testimony, having chosen to adopt that course he was required by § 253 to serve a copy of the proposed decision, findings and conclusion upon appellants, and to permit them to present argument to him before rendering his decision. We find support for this interpretation of § 253 in its legislative history.

With one salient exception, the language of § 253, as we noted in *Younkin*, is taken verbatim from § 10 of the original Model State Administrative Procedure Act which was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1946. *See* Model State Administrative Procedure Act § 10, 9C U.L.A. 182-83 (1957). The critical difference between § 253 of Art. 41 and § 10 of the original model act is that in the latter the requirements of service of the proposed decision and opportunity for argument are triggered only when a majority of officials "have not heard *or read* the evidence." (emphasis added). When the Legislature enacted the Maryland Administrative Procedure Act, Ch. 94 of the Laws of 1957, it deleted the words "or read." Indeed, the act, when first introduced in the Legislature, also included those two words, but they were deleted by amendment.[4]

There can be little doubt, in our view, that when the Legislature deleted the words "or read," it meant, for reasons of policy, to require service of the proposed decision, including findings of fact and conclusions of law, and argument whenever a majority of the decision-makers was not actually present at the taking of testimony. Thus, while not requiring those who decide to actually attend the proceeding and hear the testimony, § 253 does mandate service and argument prior to final decision where the decision-makers have only read a cold record. Here, the

---

**4.** A statutory note to the 1967 supplement to Model State Administrative Procedure Act § 10, 9C U.L.A. 182-83 (1957), suggests that the language deleted in the Maryland version from § 10 of the original model act appeared there as bracketed material.

commissioner issued the revocation order after having presumably read the record, but did so without first observing the service and argument requirements of the statute.

Despite our holding that this case is not moot, no further proceedings could ensue at the administrative level if we were to remand this case because the licenses which were revoked would now have expired in any event. Although we shall reverse here for the reasons set forth above, appellants must initiate license applications for the current year. Should the department then refuse to issue them, whether for the reasons assigned in the revocation order or on any other grounds, the entire administrative hearing procedure shall begin anew.

> *Judgment reversed; remanded to Circuit Court for Montgomery County with instructions to reverse the revocation order issued by the Commissioner of Labor and Industry; appellee to pay costs.*