799 A.2d 425

PEOPLE'S COUNSEL FOR BALTIMORE COUNTY

v.

COUNTRY RIDGE SHOPPING CENTER, INC., et al.

No. 0952, Sept. Term, 2001.

Court of Special Appeals of Maryland.

June 3, 2002.

Peter Max Zimmerman (Carole S. Demilio, on the brief), Towson, for appellant.

Sebastian A. Cross (Davis K. Gildea and Gildea, L.L.C., on the brief), Baltimore, for appellee, Southside Brokers.

Argued before KENNEY, SHARER, and CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge (Retired, Specially Assigned).

The single issue before us on this zoning appeal is whether the Baltimore County Board of Appeals, on a remand to it by this Court, adequately complied with the terms of our mandate remanding for "further proceedings." We hold that, in the procedural and factual posture of this particular case, it did.

More is involved in that holding, however, than at first glance appears. It is necessary that we dissect, at the most elemental level, the very nature and the institutional characteristics of the Baltimore County Board of Appeals specifically and, arguably, of administrative boards and agencies generally. The focus of our examination will be on the impact that periodic changes in personnel have on the institutional continuity and operational vitality of the tribunal itself.

## The Pawnshop's Petition For A Special Exception

One of the appellees, Southside Brokers, Inc., is the operator of a pawnshop. Prior to 1995, the pawnshop had been located at 8110 Pulaski Highway. When the lease on that property was about to expire, the pawnshop leased space in the Country Ridge Shopping Center, Inc., the other appellee, located at 1508 Back River Neck Road, and moved to the new location in May of 1996. The shopping center was, and is, zoned B.M. (business major). Pawnshops are permitted in a B.M. zone by way of special exception. Baltimore County Zoning Regulations, §§ 436, 233. Accordingly, the pawnshop petitioned for a special exception at its new location.

Initially the appellees ran afoul of BCZR § 436.4, which the Baltimore County Council had adopted on July 3, 1995. It provides, in pertinent part:

> 436.4 Special exception petition. *In addition to the requirements of Section 436.3 and such other requirements of these regulations relating to a special exception petition, a pawnshop is subject to the following requirements:*
>
> A. *Location may not be within a one-mile radius of any other pawnshop,* and no more than two pawnshops may be located in a councilmanic district.

(Emphasis supplied).

Invoking that provision, the Zoning Commissioner initially denied the petition for a special exception on January 22, 1996, because the relocation site was within a one-mile radius of an existing pawnshop. On a motion for reconsideration, the Zoning Commissioner on April 19, 1996 reversed his position and granted the special exception. He realized that he had failed to take into consideration the "grandfather" provision of the 1995 bill enacting the one-mile radius limitation, which had further provided:

> SECTION 6. AND BE IT FURTHER ENACTED, that pawnshops lawfully in existence and operating on the effective date of this Act are not subject to the requirements of Sections 436.4.

### The County Board of Appeals: Round One

At that point, the appellant, People's Counsel for Baltimore County, representing various residents of the Back River Neck Road area including the presidents of both the Rockway Beach Association and the Back River Neck Peninsula Community Association, appealed the decision of the Zoning Commissioner to the Baltimore County Board of Appeals.

The Board of Appeals conducted two full days of hearings, on November 6, 1996 and March 12, 1997. A public deliberation on the matter was held on April 17, 1997. One witness, the owner of the pawnshop, testified in favor of the petition for special exception. A number of witnesses testified against the

petition. On April 30, 1997, a two-to-one majority of the Board of Appeals denied the special exception. In the majority opinion, two strands of reasoning were intertwined. The ultimate outcome of this appeal may turn 1) on the extent to which those separate strands of reasoning are capable of being isolated and independently evaluated and 2) on whether they were actually so isolated and independently evaluated in the Board's decision.

On our present reading, it seems overwhelmingly likely to us that the original majority opinion of the Board of Appeals concluded, with solid evidentiary support for so concluding, that the pawnshop had failed to show, under traditional *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981) standards, that it was entitled to the special exception. This apparent conclusion of the Board of Appeals seems to have been completely independent of any consideration of the debatable one-mile radius limitation. The Board of Appeals initially set out the test that framed its analysis.

BCZR Section 502.1 sets the standards for the granting of a special exception. In this case, the special considerations are 502.1(a) and (g):

a. Be detrimental to health, safety, or general welfare of the *locality involved;* and

g. Be inconsistent with the purposes of the zoning classification, nor in any way inconsistent with the spirit and intent of the zoning regulations.

Using the standard set forth in *Schultz v. Pritts,* 291 Md. 1, [432 A.2d 1319] [(]1981[)], "the test for considering a special exception is not whether the use will have an adverse effect, but whether the *adverse effect* at the particular location is greater than ordinarily associated with the use.... Such uses cannot be developed if at the particular location proposed they have an adverse effect above and beyond that ordinarily associated with such uses. The duties *given to the Board* are to judge ... whether the use in the particular case is *in harmony* with the general purpose and intent of the plan."

Properly applying *Schultz v. Pritts,* the Board then concluded that the pawnshop would have an unduly adverse impact in the intended location.

Using the *Schultz v. Pritts* standard for granting or denying a special exception—that the proposed use would have an adverse effect above and beyond what it would ordinarily have in any area—*it would appear that a pawnshop would have more than the usual adverse effects in the area of the Country Ridge Shopping Center, because the location is the focus of intense efforts at revitalization.*

(Emphasis supplied).

The Board emphasized that the neighborhood is "the highest priority revitalization area."

Contrary to the opinion of the Zoning Commissioner, who granted this Petition, we feel compelled to recognize the qualitative judgments of the County Council and the uncontradicted testimony that *this section of Essex is in the highest priority revitalization area, has the highest incidence of negative socioeconomic indicators, and has the highest incidence of major crime in the County. These adverse effects are greater in the subject neighborhood than they would be elsewhere within the zone, which is a persuasive reason for denial of the special exception for a third pawnshop in the Essex area.*

(Emphasis supplied).

At that point, to be sure, the opinion of the Board of Appeals did not stop and announce that its reasoning to that juncture was self-sufficient to justify its decision. Had it done so, this appeal would not now be before us. The Board added to its catalogue of reasons, seemingly as little more than a makeweight, the one-mile radius limitation.

Because that locational limitation was recited as one of the factors, however, it became necessary for the Board to address the applicability of the "grandfather" provision to the relocation in this case. As the Board approached its analysis of the "grandfather" clause's applicability, it seemed to be under some arguable misapprehension as to the scope of the

"grandfather" clause exemption, if applicable. It is a plausible reading that the Board of Appeals believed that the Zoning Commissioner had erroneously deemed the "grandfather" provision to be not only an exemption from the one-mile radius limitation but, more broadly, an exemption from the required showings for a special exception generally. The Board itself made an ambiguous reference in the plural to "[1] special exception and [2] locational requirements."

In this Majority Opinion, we concur that the Council, in Section 6 of Bill No. 112–95, did exempt from the BCZR 436.4 *special exception and locational requirements* for pawnshops lawfully in existence and operating on the effective date of the Act.

(Emphasis supplied).

In any event, the Board of Appeals ruled that the "grandfather" clause exemption from § 436.4's one-mile radius limitation applied only to pawnshops that remained in place and not to those that were being relocated. On appeal to the Circuit Court for Baltimore County, the Board of Appeals was affirmed.

### The Opinion and Mandate of the
### Court of Special Appeals

The appellees appealed the denial of the special exception to this Court. The case before us focused on whether the "grandfather" clause exemption covered a pre-existing pawnshop that was in the process of relocating. Our opinion, filed on July 21, 1999, reversed the rulings of the circuit court and of the Board of Appeals and held that the "grandfather" clause exemption from the one-mile radius limitation, indeed, applied to pawnshops that were in the process of relocating.

The backbone of our opinion was our statutory construction of Baltimore County Council Bill No. 112–95, which had, on July 3, 1995, adopted both 1) the one-mile radius limitation itself, which became BCZR § 436.4; and 2) in § 6 of the Bill, the exemption for pawnshops already in existence. We held

that both the Board of Appeals and the circuit court had been unduly restrictive in their construction of the exemption.

We made it very clear, however, that the exemption for a preexisting and relocating pawnshop was only from the locational requirement specifically and not from the *Schultz v. Pritts* special exception requirements generally. Those general requirements still had to be satisfied.

> *This does not mean, however, that Appellant is entitled to have its special exception* in this case *granted,* as a matter of law, on the record before us. *There are other statutory requirements requiring favorable findings before a special exception may be approved.*

(Emphasis supplied).

Our opinion then confronted the problem of how to frame an appropriate remand. We were not sure what it was that the Board of Appeals had actually done. On the one hand, the Board of Appeals noted that the County Council had, in Bill No. 112–95, "provided a statement of purpose and a set of performance standards in regard to the situation for pawnshops" and had used such terms with respect to pawnshops as "adverse effect," "particular location," and "disruption of the harmony of the comprehensive plan of zoning." Using the *Schultz v. Pritts* standards, the Board had then unequivocally concluded

> that *the proposed use would have an adverse effect above and beyond what it would ordinarily have in any area*-it would appear that *a pawnshop would have more than the usual adverse effects in the area of the Country Ridge Shopping Center.*

(Emphasis supplied).

After cataloguing the especially sensitive characteristics of the Back River Neck Road neighborhood, the Board, with no mention yet of the locational requirement, asserted what may well have been its dispositive conclusion.

> *These adverse effects are greater in the subject neighborhood than they would be elsewhere within the zone,* which is

a persuasive reason for denial of the special exception for a third pawnshop in the Essex area.

(Emphasis supplied).

If, indeed, that is what the Board meant to do, its further mention of the locational requirement was both redundant and unfortunate. As a good rhetorician frequently does, however, the Board chose to unleash maximum firepower. The barrage of persuasion included, counterproductively it turned out, a mention of the locational factor. The Board neither asserted nor disclaimed that factor as a *sine qua non* of its decision.

This Court in its opinion opined that, if the locational factor had, indeed, influenced the Board's decision, the Board's decision was flawed.

[A]n existing pawnshop seeking to relocate, though it must otherwise obtain a special exception as to the proposed new location, is entitled to have its special exception application evaluated free of the standards prescribed in Section 436.4.

In the last analysis, however, we were not sure if the factor had played a part in the Board's decision and we concluded, therefore, that a "new consideration" by the Board would be "necessary." We did not presume, however, to micromanage how the Board should undertake that "new consideration."

*The Board's majority opinion* addressed those other requirements somewhat, but did so in a manner that *commingled its consideration of those requirements with those of Section 436.4.* On remand a new consideration of Appellant's application will be necessary.

(Emphasis supplied).

Our mandate read:

CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTION TO REMAND TO THE BOARD OF APPEALS FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

### A Complicating Factor: The Change of Personnel

The Board that initially denied the special exception on April 30, 1997, consisted of three members. S. Diane Levero and Harry E. Buchheister, Jr., issued the majority opinion. Charles L. Marks was in dissent. By the time the Board, on remand, issued the decision now under review on December 13, 2000, Ms. Levero and Mr. Buchheister were gone. They had been replaced by Donna M. Felling and Margaret Worrall. Mr. Marks remained as a holdover member of the Board.

### The County Board of Appeals: Round Two

The two new members of the Board of Appeals "reviewed the testimony and record" of the earlier denial of the petition by the Board in 1997. A full public deliberation was held by the Board on August 16, 2000. The detailed Minutes of that Deliberation reflect discussions among the members about 1) the opinion of the Court of Special Appeals and 2) the remand and its implied directive to examine whether the "adverse impact" in the requested location would be "greater than elsewhere in the zone."

By a two to one vote, the Board again voted to deny the special exception. The majority noted its special reliance on the testimony of Mary Emmerick, the Eastern Sector Coordinator for the Baltimore County Office of Community Conservation. The majority called attention to her testimony about 1) the neighborhood's "having the highest crime rate in Baltimore County," 2) the public funding that was being directed into special rehabilitation plans for the neighborhood, 3) some federally funded community "cleanup" programs "in the immediate vicinity of [the] Country Ridge Shopping Center," and 4) the characteristics of the shopping center as "a neighbor shopping center" because "many people walk to the center because they do not have use of private transportation."

The Minutes also recited that the majority called attention to the testimony of Orlando Yarborough, who operates a nonprofit organization for at-risk families and youth located

across from the shopping center. The majority called attention to the testimony of both 1) John J. Dillon, a 29–year veteran of the Office of Planning and Zoning who had been "accepted by the Board as an expert planner in Baltimore County"; and 2) Captain James Johnson of the Baltimore County Police Department and the Precinct Commander in Essex, who testified that "the area immediately around the Country Ridge Shopping Center suffers from some of the highest public safety warning indicators in all of Baltimore County—a scourge of narcotic activity, recently a rash of robberies, socioeconomic decay." The majority members also noted reliance on "documenting materials" from the Baltimore County Council and the Baltimore County Planning Board.

On December 13, 2000, the Board issued a ten-page Majority Opinion and an eight-page Dissenting Opinion by Charles L. Marks. By a vote of two to one, the special exception was again denied. On December 19, 2000, the appellees filed a Motion for Reconsideration with the Board, stressing the procedural point that a *de novo* hearing should have been held because two members of the Board on remand had not been members of the original 1997 Board. On January 12, 2001, the Board unanimously denied the Motion for Reconsideration.

### Reversed by the Circuit Court

The appellees promptly appealed both the denial of the special exception and the denial of the reconsideration to the Circuit Court for Baltimore County. The circuit court on June 13, 2001, reversed the Board of Appeals and remanded for a *de novo* hearing. In rendering its decision, the court stated:

> This Court concedes that a remand from the CSA does not automatically require the Board to hold a new hearing in every case. This Court will also concede that a remand to a Board with two new members does not always require a *de novo* hearing. However, due to the totality of circumstances in this case, it is this Court's opinion that a *de novo* hearing was required. Petitioner has persuaded this Court that *Prosser* is not applicable in this case. There, the

remand was on a limited technical issue. In the case *sub judice,* the remand is for a "new consideration" of an application for Special Exception, which unquestionably is not a limited technical issue. It is the opinion of this Court that *Clark* is applicable as witness credibility and demeanor is certainly an important factor in the Board's decision to grant or deny an application.

## The Appealability of The Remand Order

■ People's Counsel has appealed to us that reversal and remand by the circuit court. With respect to the immediate appealability of such an action, *Schultz v. Pritts,* 291 Md. 1, 6, 432 A.2d 1319 (1981), was clear:

> [A] circuit court's order remanding a proceeding to an administrative agency is an appealable final order.... When a court remands a proceeding to an administrative agency, the matter reverts to the processes of the agency, and there is nothing further for the court to do. Such an order is an appealable final order because it terminates the judicial proceeding and denies the parties the means of further prosecuting or defending their rights in the judicial proceeding.

## Standard of Appellate Review

Although the judicial act being appealed to us is literally the June 13, 2001 ruling of the Baltimore County Circuit Court, our review will look not so much *at* the circuit court action as *through it* to the December 13, 2000 decision of the Baltimore County Board of Appeals. As we explained in *Pollard's Towing, Inc. v. Berman's Body Frame & Mechanical, Inc.,* 137 Md.App. 277, 287, 768 A.2d 131 (2001):

> At the outset, let it be clear whose decision is being reviewed and by whom. The review on the ultimate merits is now being conducted by this Court. *We are not reviewing the procedural correctness of the earlier review by the circuit court. We are undertaking our own de novo review of the decision of the administrative agency.* As Judge Motz explained in *Department of Health and Mental Hy-*

*giene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994):

> Moreover, it is well recognized in Maryland that, *when reviewing administrative decisions, the role of an appellate court is precisely the same as that of the circuit court.* See e.g., *Baltimore Lutheran High Sch. Ass'n, Inc. v. Employment Security Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985) ("a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test"). For those reasons, rather than remanding to the circuit court for it to determine, under the correct legal standards, whether the SOPD's decision is based on substantial evidence, we shall address the question.

(Emphasis supplied). See also *Stover v. Prince George's County,* 132 Md.App. 373, 380–81, 752 A.2d 686 (2000). *The decision of the circuit court, therefore, is before us only in a pro forma capacity, as the necessary procedural conduit by which the decision of the administrative agency gets to us for our review.*

(Emphasis supplied).

In this case, moreover, we are reviewing the Board of Appeals's interpretation of what its own earlier action had been and what its reason had been for so acting. That is neither a finding of first-level fact nor a ruling of law. Whether considered as something akin to "a mixed question of law and fact" or as the type of judgment call to which the abuse of discretion standard typically applies, it clearly is the kind of decision to which a reviewing court extends great deference. As Judge James Eyler explained in *Powell v. Calvert County,* 137 Md.App. 425, 432, 768 A.2d 750 (2001), *reversed on other grounds,* 368 Md. 400, 795 A.2d 96 (2002):

> An agency's factual findings and its decisions involving mixed questions of law and fact, however, will be given deference such that we cannot substitute our judgment for that of the agency's. *Friends of the Ridge v. Baltimore Gas & Elec. Co.,* 120 Md.App. 444, 465, 707 A.2d 866 (1998),

*vacated in part by* 352 Md. 645, 724 A.2d 34 (1999). We will "accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record."

We need not necessarily agree that the Board of Appeals was correct in its interpretation of its earlier decision. We will affirm its interpretation if there was any reasonable basis that could have supported it. We now look to the Board's response to our remand.

### An Open–Ended Remand

Our remand for "further proceedings" was deliberately open-ended. We reject the appellees' argument that "further proceedings" necessarily implies a *de novo* hearing, with witnesses being called and arguments being made as if for the first time. "Further proceedings" could, of course, embrace such a procedure but could also embrace other less radical procedures. It was not for us to anticipate what "further proceedings" might be required. That was a determination to be made in the first instance by the Board of Appeals itself, consistent, of course, with the salient principle of law enunciated in our opinion, to wit, consistent with our statutory interpretation of § 6 of County Council Bill No. 112–95. Beyond that, we did not presume to determine what "proceedings" were required. Theoretically, the Board could have made three or four different determinations as to what "further proceedings" might under the circumstances be appropriate.

1. The Board could have decided simply to clarify its earlier rationale that had been inadvertently ambiguous. It could have said, "We are stating unambiguously **NOW** what it was that we were intending to say **THEN**." This would simply be a present clarification of a past decision, not a new decision. *Powell v. Calvert County,* 137 Md.App. 425, 441, 768 A.2d 750 (2001), *rev'd on other grounds,* 368 Md. 400, 795 A.2d 96 (2002) ("If the court cannot tell if the administrative agency was right or wrong . . . the court should remand to the agency for further proceedings.").

2. The Board could have decided to make a *de novo* policy decision based on, for instance, three proper factors, ignoring the fourth factor that had initially been improperly considered. The factors themselves having been correctly established, there would be no need for further fact-finding with respect to them. There remained only to make the ultimate policy determination based on a present consideration of the appropriate number of already established factors. *State Tax Comm'n v. Chesapeake & Potomac Telephone Co.,* 193 Md. 222, 232, 66 A.2d 477 (1949) ("Evidence may be said to have been 'considered' when it has been reviewed by a court to determine whether any probative force should be given it."); *People's Counsel v. Mockard,* 73 Md.App. 340, 346–47, 533 A.2d 1344 (1987); *People's Counsel v. Prosser Co.,* 119 Md.App. 150, 161–62, 180, 704 A.2d 483 (1998).

3. The Board could have decided that the record before the Board initially was incomplete and that it would be desirable **TO SUPPLEMENT** that record with additional argument or additional evidence. New witnesses could be called but the old witnesses would not have to be recalled. *Lawton T. Sharp Farm v. Somerlock,* 52 Md.App. 207, 209–12, 447 A.2d 500 (1982).

4. The Board could have decided to ignore the original record and to proceed *de novo* with an entirely new hearing as if the first hearing had never occurred.

The first two of those procedural options on remand would almost always be offered as a combined package of alternatives. Under the first optional procedure, if the Board of Appeals were to say, "We had decided and we meant to convey that the other factors, even absent the locational factor, were sufficient for us to deny the special exception," that clarification in the affirmative would be enough and there would be no need to proceed to the second optional procedure. Conversely, if the Board of Appeals were to say, "We had decided and we meant to convey that the aggregate of all of the factors, including the locational factor, was indispensable to our decision to deny the special exception," that clarification

in the negative would be enough and there would be no need to proceed to the second optional procedure. Neither of those clarifications would represent a new decision.

If, on the other hand, the Board of Appeals were to say, "We never gave any thought to what we would do, one way or the other, on the basis of less than all of the factors," then it would be necessary for the Board of Appeals to proceed from procedural option one to procedural option two, if it should deem option two adequate for its task on remand.

As we read what the Board of Appeals did on remand, especially in its denial of the appellees' Motion for Reconsideration wherein it provided introspective insight into its own earlier thinking, we conclude that it chose to follow the first of the four procedures listed above. Alternatively, it is conceivable that it was utilizing the second procedure. Our analysis, therefore, will consist of examining whether those two procedures were, in the circumstances of this case, within the Board's rightful prerogative. If they were, whichever of the two alternative procedures was actually utilized is not of critical importance.

### Two Distinct Subissues

Two subissues are intertwined. We deem it helpful to isolate them for analysis. The first is that of whether either or both of the procedures possibly utilized by the Board on remand would have been within its rightful prerogative if, hypothetically, there had been no change in the personnel making up the Board. The second and distinct issue will then be whether a change in a critical voting majority (or, indeed, any change) in the make-up of the Board might *ipso facto* render a procedure on remand illegitimate that would otherwise have been, without such a change in personnel, legitimate.

### Remand Procedures By An Unchanged Board

■ Assuming, *arguendo*, that the members constituting the administrative tribunal remain unchanged, if an appellate court is in doubt as to why an administrative agency did what

it did, as we were in this case, it is appropriate to remand the case to the agency for nothing more than 1) a clarification of or 2) an amplification of its reasoning. In *Powell v. Calvert County,* 137 Md.App. 425, 429, 768 A.2d 750 (2001), *reversed on other grounds,* 368 Md. 400, 795 A.2d 96 (2002), we approved precisely such a procedure.

> As a result of an earlier petition for judicial review, this Court, in an opinion filed on April 23, 1999, vacated the board's approval and remanded the case to the Board for further proceedings on the ground that the reasons given by the Board were insufficient to permit appellate review. *On remand, without receiving additional evidence or argument, the Board amended its opinion in response to this Court's mandate and granted the special exception.* The case is now before us as a result of a second petition for judicial review. *We hold that the evidence and reasons given by the Board* in its amended opinion *are,* as explained herein, *legally sufficient to support the Board's decision.*

(Emphasis supplied).

The opinion of Judge James Eyler made it very clear that an appellate court may remand to an administrative agency simply so that the agency can clarify its reasoning.

> A decision of an administrative agency should be upheld only if it can be sustained on the findings and reasons given. *Montgomery County v. Stevens,* 337 Md. 471, 482, 654 A.2d 877 (1995); *Harford County v. Preston,* [*Inc.,*] 322 Md. 493, 505–06, 588 A.2d 772 (1991).

> If the record fails to reflect such findings or reasons, the appropriate remedy is a remand to the agency with directions to comply with the requirement. *Stevens,* 337 Md. at 481–82, 482, 654 A.2d 877. *If the court cannot tell if the administrative agency was right or wrong, or to put it more accurately, whether it committed error because the court cannot discern the basis of the agency's decision to determine if it was proper, the court should remand to the agency for further proceedings.*

137 Md.App. at 441, 768 A.2d 750 (emphasis supplied). See also *People's Counsel v. Mockard,* 73 Md.App. 340, 533 A.2d 1344 (1987); *Mortimer v. Howard Research,* 83 Md.App. 432, 442, 575 A.2d 750 (1990).

Assuming again, *arguendo,* that the membership of the Board of Appeals was the same when it received the case on remand as it had been when it considered the case initially, we conclude that it would have been within the legitimate prerogative of the Board to have proceeded under any of the four procedural options listed above. Even counsel for the pawnshop conceded as much in his final argument before the Baltimore County Circuit Court.

> I'll concede that, your Honor, if there were the three original members who heard the case and that it was remanded, they could make those findings from their recollection of the witnesses and the evidence.

### The Board's Action on Remand Was a Clarification

Our reading of the 18–page opinion of the Board of Appeals following its consideration of the case on remand, and our further reading of the 6–page opinion of the Board in denying the appellees' Motion for a Reconsideration, convinces us that what the Board did on remand was no more than to clarify what it had earlier done on April 30, 1997. The Board made it clear that its initial 1997 denial of the special exception had not depended on the one-mile radius limitation and that it had not considered that limitation to be a critical factor in its decision.

The December 13, 2000 opinion of the Board, to be sure, is not a model of polished appellate draftsmanship. At times, it slides into linguistic habits that are more appropriate to factfinding. We are not unmindful, however, that even trained appellate courts also occasionally misuse the verb "find" when they should say "hold." ("We *find* the law to be . . ."; "We *find* the trial court to have been in error.") Even Homer nods. The occasional use by the Board of the verb "find," therefore, is not, we hold, dispositive as to what function the

Board was performing. Neither do we conclude that the occasional and inartful use of the verbs "concur" and "affirm" establishes that the Board was sitting in appellate review of its own earlier decision.

The appellees seize upon these random usages, however, as upon the terms of a covenant. We would urge them to heed instead our admonition in *Heinlein v. Stefan,* 134 Md.App. 356, 368–69, 759 A.2d 1180 (2000):

It is tempting, particularly when it serves one's purpose, to ascribe oracular significance to what may be nothing more than stylistic happenstance in an opinion's wording, but that is not the way the opinion writing business works. The other members of an appellate panel scrutinize with painstaking care the opinion writer's articulation of the actual decision in a case. That is why in Anglo American jurisprudence actual holdings are given precedential status. The other panel members, however, do not hover critically over every word of an opinion writer's phraseology as if it were being chiseled in marble. For that matter, neither does the opinion writer. When the narrative juices are flowing, a writer's ultimate choice of words is frequently nothing more than a subliminal stylistic reflex.

There were counter-indications that the Board was merely clarifying or explaining its earlier action and, although the issue could plausibly be argued either way, those counter-indications persuade us that the Board, on remand, was engaged only in clarifying and not in either fresh fact-finding or appellate reviewing.

In characterizing what the Board had done in 1997, the Board on remand summarized what had in 1997 been established as the dispositive factors. It made no mention of the one-mile radius limitation.

In denying the Petitioner a special exception for a pawn-shop to be relocated in the Country Ridge Shopping Center, it is abundantly clear that the Board of Appeals, in its majority opinion, relied on the evidence and concepts considered in the legislative findings and Baltimore County

policy as found in Bill No. 112–95 as well as the testimony of Baltimore County employees in the Police Department, the Office of Planning and the Office of Community Conservation.

With regard to standards set forth for the granting of a special exception in BCZR 402.1, this Board affirms the majority opinion that the Petitioner did not meet the special considerations of 502.1(a) and (g):

Before any Special Exception may be granted, it must appear that the use for which the Special Exception is requested will not:

A. Be detrimental to health, safety, or general welfare of the locality involved; and

B. Be inconsistent with the purposes of the zoning classification, nor in any way inconsistent with the spirit and intent of the zoning regulations.

The uncontradicted evidence, with no reference to the one-mile radius, had made it clear that the pawnshop would have an adverse impact on that neighborhood that it would not have elsewhere.

Evidence and testimony are uncontradicted that the Essex–Middle River area is a section of Baltimore County designated the highest priority for revitalization and conservation. It has the lowest socioeconomic indicators and the greatest incidence of crime. There are already two pawnshops in the area. A third pawnshop in this area would be detrimental to health, safety, and specifically the general welfare of this particular area of Baltimore County.

In their Motion for Reconsideration of December 19, 2000, the appellees challenged the December 13 Opinion of the Board for the failure of the Board to have held a *de novo* hearing, particularly so the new members of the Board could "make findings on credibility." In denying that motion, the Board unequivocally stated what the nature of its decision on remand had been.

On January 3, 2001, the Board again met in public session and deliberated the matter; and denied the Motion for

Reconsideration. At the time of the public deliberation concerning the Motion for Reconsideration, the Board indicated that it could not find anywhere in the remand order that the Court of Special Appeals required any further hearings and that it was left exclusively to the discretion of the County Board of Appeals as to whether or not any further hearings should or should not be held. The Board takes significant note of the fact that the majority of the panel had already reviewed the record and denied the special exception. *The only issue determined by the panel on remand concerned the process to ascertain whether or not that denial stood independent of, or "free of the BCZR 436.4 standards." In its December 13, 2000 Opinion* at page 9, concurring with the original Board majority, *the current majority effectively found that,* based on this record, *the original majority decision to deny the special exception stood free of the BCZR 436.4 standards and was independent of them.*

(Emphasis supplied).

Significantly, the opinion of the Board denying the reconsideration was unanimous. The hold-over Board member, who had been in dissent on the merits both in 1997 and again in 2000, agreed with his colleagues as to the nature of what the decision had consisted of on remand. It cannot be gainsaid that the Board would have been entitled, without an evidentiary rehearing, to issue such a clarification of its own earlier action, had there been no change in the membership of the Board

### Reweighing Established Factors Versus Resolving Disputed Credibility

That is not, however, all the Board would have been entitled to do on remand without an evidentiary rehearing. Among the other procedural options would have been the *de novo* weighing, essentially a policy determination, of already established factors without any necessity of fresh fact-finding as to the existence of those factors.

Such a reweighing is, not uncommonly, what happens in the relitigation of mixed questions of law and fact. First-level fact-finding, frequently requiring the resolution of disputed credibilities and necessitating the choice of competing versions of the facts, is no longer involved. That fact-finding function is a *fait accompli*. It is only after the first-level facts have once been established that the second-level question even arises of what to make of those facts. That second-level question may be revisited without any necessity of revisiting the first-level fact-finding. The only question that matters is no longer, "What will actually happen in the neighborhood?" but, "What is the significance of what will happen in the neighborhood?" On such a mixed question of law and fact, the decisional process is far more one of policy-making than of fact-finding. The decisional process involves the application of the law, or of the policy, to an already given set of facts.

With some frequency, tribunals are called upon to engage in a *de novo* reassessment of the significance of established factors even though those tribunals never saw a witness and never participated in any of the first-level fact-finding that went into the establishment of those factors. Appellate courts, far from the action of resolving disputed credibilities or choosing among contradictory versions of events, frequently engage in the *de novo* process of weighing the significance of predicate facts found by others and then deciding for themselves the ultimate, conclusory fact, such as probable cause, the voluntariness of consent, the voluntariness of a confession, etc. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Chancellors in equity frequently make decisions based on facts that were found by Masters. The two levels of decision making are distinct.

The essentially undisputed first-level facts in this case were established and precisely articulated by the Board of Appeals in its initial Opinion of April 30, 1997. From that moment on, they were not in any way in dispute. The Board, on remand, could readily have reassessed the ultimate second-level or conclusory fact of adverse impact on a special neighborhood

without any occasion to revisit the predicate first-level facts. It could have concluded:

> Our predecessors may arguably have considered as many as four factors in deciding to deny the variance. We have now been told by the Court of Special Appeals that the fourth of those factors should not have been considered. Accordingly, we will now eliminate that factor from the equation as we decide what significance to give the other three factors, standing alone. We conclude, on the sole basis of those remaining factors, that the granting of the variance at the location in question would have an adverse impact that it would not have elsewhere in the zone. The variance is, therefore, denied.

It cannot be gainsaid that the Board would have been entitled, without an evidentiary rehearing, to engage in such a reweighing of the significance of already established factors, had there been no change in the membership of the Board.

### "The Regiment Goes On"

In this case, however, there was a change in the membership of the Board. Two of the three members of the Board that received the case on remand in 2000 had not been members of the Board that initially denied the variance in 1997. To whom or what, therefore, did the Court of Special Appeals remand the case? To the same Board that had initially decided it or to a new Board? It is not a simple question. Involved is the essential nature of the Baltimore County Board of Appeals itself.

The appellees, at least for purposes of this case, conceptualize the Board of Appeals as little more than a petit jury, with no life of its own before or after the immediate adjudication. If the appellees were correct in their conceptualization, the Board, following any change in the personnel who from time to time make it up, would be unable to engage in the most minor reconsideration without starting the process all over again. Institutional continuity would terminate with the end of tenure of any of its members.

We conceptualize the Board of Appeals as an ongoing governmental entity, not as an *ad hoc* petty jury. It is an administrative tribunal with an institutional life that transcends the tenure of any of its members. Courts, by parity of behavior, unabashedly use the first personal pronouns "we," "us," and "our" in describing decisions made a century before any current member of the court was born. In this phenomenon of institutional continuity there are echoes of the stirring epilogue of a John Wayne epic,[1] "The names may change; the faces may change; but the regiment goes on." Thus it is with the Baltimore County Board of Appeals. It has a life that goes on beyond the tenure of any of its members.

### The Caselaw On Changes in Membership

It remains then to be seen what, if any, limitations the caselaw may have imposed on the exercise of that institutional continuity. In urging that the change in the membership of the Board mandated an evidentiary rehearing on remand, the appellees rely primarily on the case of *Clark v. County Board of Appeals for Montgomery County*, 235 Md. 320, 201 A.2d 499 (1964).

Even to the extent that *Clark* retains any limited vitality, it provides no support for the proposition for which the appellees cite it. *Clark* was a case in which the Montgomery County Board of Appeals had granted a special exception. *Clark* did not involve a remand. *Clark* did not involve any change in the membership of the County Board of Appeals. *Clark* did not involve the modality by which a board member may receive evidence—hearing witnesses versus reviewing a transcript.

*Clark* involved the statutory construction of what was then § 104–22d of the Montgomery County Code (1960). The Court of Appeals concluded in *Clark* that the code provision that "all actions or decisions of the board shall be taken by a resolution, in which at least three members must concur" established a minimum quorum of three in order for the

---

1. "Fort Apache" (1948).

required public hearing on the matter to have any validity. 235 Md. at 323–24, 201 A.2d 499. Although a third board member had read the transcript and concurred in the decision of his colleagues, only two members of the board had actually been present at the required public hearing. The Court concluded that it was dealing with a "problem of statutory construction" and held that the absence of the required quorum rendered the hearing, and the decision reached at that hearing, a nullity.

Other state courts have taken a contrary view, and require the presence at the hearing or hearings of all members who participate in the decision. *We think the cases holding that at least enough members to constitute a quorum for decision, be present at the public hearing, are more consistent with our construction of the ordinance* in the instant case, and with our prior decisions. Accordingly, we hold that the Board's decision was improperly reached and the order must be reversed.

235 Md. at 325, 201 A.2d 499 (emphasis supplied).

The Baltimore County Board of Appeals in this case, by contrast, was in full compliance at all times with the quorum requirement. Rule 1c of the Rules of Practice and Procedure of the Baltimore County Board of Appeals provides, in pertinent part:

Three (3) members of the board of appeals, as designated by the chairman, shall sit for the purpose of conducting the business of the board; and a majority vote of two (2) members shall be necessary to render a decision.

That requirement was never violated.

The only comfort the appellees could take from the *Clark* opinion is the dictum:

Insofar as the case may turn on the credibility of the witnesses, absent members do not have the opportunity of seeing and hearing the witnesses.

235 Md. at 324, 201 A.2d 499.

One year and a half after the *Clark* decision, the Court of Appeals decided *Younkin v. Boltz,* 241 Md. 339, 216 A.2d 714

(1966), another special exception case out of Montgomery County. It was a disservice for the appellees in their brief to have totally ignored the *Younkin* case, for it flatly precludes the "spin" they seek to put on *Clark*. It is *Younkin* that is absolutely dispositive of the issue before us.

The evidentiary hearings on the special exception in *Younkin* were spread over two days. Only three of five board members were present for the first day's hearing and only two of those three ultimately voted to grant the special exception. The necessary majority vote to grant the exception depended on at least one of the two additional board members, who joined their colleagues for the second day of the hearing but who had missed the first day. Judge Hammond, 241 Md. at 341–42, 216 A.2d 714, summarized what had happened and before whom it happened.

> The first hearing was held on February 27, 1964. Ten witnesses gave one hundred sixty-four pages of testimony. The second hearing was held on April 9, 1964, and the three members who had been at the first hearing were joined by *the other two members of the Board who had read the transcript of the testimony taken at the first hearing and had examined the record.* Five additional witnesses gave fifty-four more pages of testimony at the second hearing. At the conclusion of the testimony at the second hearing, *the matter was fully argued to the five members of the Board by counsel* for the petitioner and counsel for the protestants, with full and generally explicit references to particular witnesses and the essence of their testimony.

(Emphasis supplied).

Following the grant of the special exception, the protestants appealed, claiming that an indispensable member of the majority had not been present for the first day's hearing and had not seen the first day's ten witnesses or had the opportunity to assess their credibility. The trial judge, relying on the *Clark* case, reversed the Board of Appeals.

> The instant case presented a variation of the *Clark* factual situation. There were two hearings; three members of the Board attended both and the other two members attended

only the second hearing. Only two of the three members who had been at both hearings voted to grant the exception and *the requisite third vote* (and a fourth) *came from a member who had been at the second hearing only.* ... Judge Shure ruled that under *Clark* the Board's action was illegal and ineffective in that only two of the three who had heard all the testimony voted to grant the exception.

241 Md. at 341, 216 A.2d 714 (emphasis supplied). It is that reading of *Clark* that the appellees now urge upon us.

In *Younkin,* however, the Court of Appeals reversed the trial judge and rejected that reading of *Clark.* It adopted, rather, the federal and the majority state view, disdained by *Clark,* that it is not required that a voting member of an administrative agency shall have heard the witnesses so long as the member shall have "considered and appraised the evidence."

The general rule in both the federal and state systems is that in the absence of specific statutory direction to the contrary *the deciding member or members of an administrative or quasi-judicial agency need not hear the witnesses testify.* 2 Davis, Administrative Law Treatise § 11:02, p. 40.

"*The* [federal] *Administrative Procedure Act,* of course, *assumes that deciding officers need not be present at the hearing* * * *.

"The law of nearly all state courts is as clear as the law of the federal courts that *deciding officers need not be present when witnesses testify;* this attitude is implicit in most of the state cases discussed in the ensuing two sections."

The general rule is that *it is enough if those who decide have considered and appraised the evidence* and *the courts feel more satisfied that they have done so if they have heard argument.*

241 Md. at 342–43, 216 A.2d 714 (emphasis supplied).

Judge Hammond added that that procedure was fully consonant with the Maryland Administrative Procedure Act, as well as with the Model Administrative Procedure Act.

*The Maryland Administrative Procedure Act,* applicable to state board and agencies as defined, Code (1965 Replacement Vol.), Art. 41, §§ 244–56, *contemplates* (as does the model Administrative Procedure Act, 8C Uniform Laws Annotated, on which it was based) *that in a "contested case" the evidence need not be heard by all those who will render the final decision.* Section 253 provides:

Whenever in a contested case, a majority of the officials of the agency who are to render the final decision have not heard the evidence, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made until a proposal for decision, including findings of fact and conclusions of law, has been served upon the parties, and *an opportunity has been afforded to each party adversely affected to file exceptions and present argument to a majority of the officials who are to render the decision, who shall personally consider the whole record or such portions thereof as may be cited by the parties.*

241 Md. at 344, 216 A.2d 714 (emphasis supplied). That provision of the Administrative Procedure Act, without any significant change, is now codified as Md.Code, State Government Article, § 10–216(2).

The Court of Appeals, in conclusion, acknowledged that the *Clark* case could not, at least in its tone, be fully reconciled with *Younkin v. Boltz* and it politely confined *Clark* to its own precise facts.

In any event, we see no reason to extend the holding in *Clark* to a case not precisely similar on the facts.

241 Md. at 344, 216 A.2d 714.[2]

The Court of Appeals has regularly followed *Younkin v. Boltz. Bethesda Management Services v. Dep't of Licensing and Regulation,* 276 Md. 619, 627–28, 350 A.2d 390 (1976); *Gemeny v. Prince George's County,* 264 Md. 85, 94, 285 A.2d

---

**2.** Professor Max Radin observed that when an appellate court confines one of its own earlier opinions to "its own facts," that is the way appellate courts have "of administering euthanasia to their own nonviable progeny."

602 (1972); *Hyson v. Montgomery County Council*, 242 Md. 55, 72, 217 A.2d 578 (1966). This Court has also recognized its authority. In *Howard County v. Bay Harvestore System*, 60 Md.App. 19, 22, 478 A.2d 1172 (1984), Judge Weant observed:

> The circuit court found the practice of permitting absent members of the Board to participate in a decision, provided they had familiarized themselves with the testimony, was in accordance with standard State and Federal procedures. *See Younkin v. Boltz*, 241 Md. 339, 216 A.2d 714 (1966).

See also *Citizens for Rewastico Creek v. Commissioners of Hebron*, 67 Md.App. 466, 478, 508 A.2d 493 (1986).

The case of *People's Counsel for Baltimore County v. Prosser Co.*, 119 Md.App. 150, 704 A.2d 483 (1998), is, on its procedural facts, almost indistinguishable from the case now before us. It is a decision, moreover, that looms large in the arguments that have been made to us. The Circuit Court for Baltimore County had vacated a decision by the Baltimore County Board of Appeals and had remanded the case to the Board "for further consideration." By the time of the remand, however, the membership of the Board had changed.

> *The case was* then *remanded* to the Board pursuant to the circuit court's order. *Two of the three original Board members had resigned by that time.* ... *A new three-member panel was formed, which included the carry-over member from the original panel* who had voted to approve the application previously. The new panel, after reviewing the transcript of the 1994 hearing, denied appellants' request to present new evidence. The Board, through the new panel, held public deliberations on June 5 and July 3 and, in an opinion dated September 19, 1996, determined that the reclassification was warranted and granted the rezoning.

119 Md.App. at 162, 704 A.2d 483 (emphasis supplied).

The challenge made to the failure of the Board of Appeals, on remand, to conduct a new evidentiary hearing in this case echoes precisely the challenge made in that case. In *Prosser*, we rejected the claim that a *de novo* evidentiary hearing was

necessary. That was the actual holding of *Prosser*. By way of explaining our holding, however, we were actually far gentler with the argument than we need have been in light of *Younkin v. Boltz*, a case that was not cited to us.

> The Board recognized that there was no adverse expert testimony on the issue on remand and that the issue was of a technical nature. The Board noted that the evaluation of lay witness credibility and demeanor was not a material factor in determination of the issue before it. We believe that the Board could have properly premised its decision on a review of the transcript and the remainder of the written record. In our view, the holding in *Clark* has not been violated when a quorum participates in the proceedings on remand and when as assessment of credibility of witnesses is not required.

119 Md.App. at 180, 704 A.2d 483.

■ The distinction made by *Prosser* between those remands that call for a resolution of disputed credibilities and those remands that do not, even assuming the distinction to be a viable one, would not help the appellees here in any event. The remand in this case did not entail any assessment of the credibility of lay witnesses or, indeed, any further first-level fact-finding. Even if, *arguendo*, the need to resolve on remand the credibility of lay witnesses were the key criterion in distinguishing a broad from a narrow remand, the appellees in this case would not have been entitled to the broad *de novo* evidentiary hearing they seek.

That entire observation as to the impact of *Prosser*, however, is in the subjunctive mood. Our holding is that, under the direct authority of *Younkin v. Boltz*, the appellees were not entitled to a *de novo* evidentiary hearing regardless of whether lay credibility were still in dispute or not.

A critical member of an administrative tribunal is not required to do more on remand than would, under *Younkin v. Boltz*, have been required the first time around. In *Younkin*, a vote critical to the Board of Appeals's decision was cast by a board member who, albeit having read the transcript of testi-

mony and having heard full argument, had not personally observed the demeanor of ten witnesses (out of a total of fifteen) whose testimony filled one hundred sixty-four pages of the transcript. There was no suggestion in the opinion that credibility had not been in dispute in assessing the testimony of the fifteen witnesses. The failure of a critical voting member to have observed personally the testimony of ten of those witnesses gave the Court of Appeals no pause, just so long as the member had read the transcript and heard the argument.

> [A]ll *the members of the Board had considered and appraised all the evidence, first* by either hearing it first hand or *by reading it, and second by hearing full argument* which was directed to the strengths and weaknesses of the testimony for the respective sides. We think the Board's action was properly taken.

241 Md. at 345, 216 A.2d 714 (emphasis supplied). That is dispositive of the issue before us.

A further word is nonetheless in order to explain why we made the distinction we did in *Prosser,* lest it lead the unwary astray. Our basic determination in *Prosser* was to affirm the trial court and to reject the challenge there being made to the remand procedure utilized by the Board of Appeals on that occasion. We were unaware of *Younkin v. Boltz,* however, which would have provided a simpler rationale for what we intended to do in any event. We were faced with what we believed to be the continuing vitality of *Clark v. County Board of Appeals, supra,* and the "spin" that was being put upon it.

Under those circumstances, the distinction we drew between one hearing modality required on certain remands and another modality permitted on others was necessary, we thought, to distinguish *Prosser* from *Clark.* We affirmed the County Board of Appeals in *Prosser,* using that more circuitous rationale. Under the banner of *Younkin v. Boltz,* however, we would have reached the same result more quickly and more easily without any necessity for the convoluted "credibility-resolving" rationale, which may now mercifully evanesce. We

reverse the judgment of the circuit court so that we may, in effect, affirm the judgment of the County Board of Appeals.

## The Preemption Argument

 When the appellees first went to the circuit court in 1998, they argued for the first time that state law, Maryland Code, Business Regulation Article, § 12–101 *et. seq.*, preempted the field of regulating pawnshops and thereby rendered unconstitutional both 1) BCZR § 436.2(D), which imposes a countywide "cap" of twelve on the number of pawnshops in the county; and 2) BCZR § 436.4(A), which provides, *inter alia,* that there shall be no more than two pawnshops in any councilmanic district. In its opinion of February 9, 1998, the circuit court ruled that the county zoning regulation is not unconstitutional. When the appellees first appealed to this Court, they again raised the preemption issue. In our first opinion of July 21, 1999, we decided that, because of our reversal on other grounds, it was not necessary to address the preemption issue.

Although we would be strongly inclined to hold against the appellees on the basis of either 1) non-preservation for failure to raise the issue before the Board of Appeals either in 1997 or 2000 or 2) the ultimate merits, we will be content, in the interest of judicial economy, to rest our holding on the ground of mootness.

The appellees' attack on § 436 is two-pronged. They claim that Baltimore County does not possess

the right to regulate in such a manner as to limit the number of state licensed pawnshops in the County to twelve and the number of pawnshops in each councilmanic district to two.

With respect to the countywide "cap" of twelve on the number of pawnshops, the appellees never ran afoul of that limit and it had no adverse impact on them in any way. It was never remotely alluded to as a basis for denying the special exception in this case.

With respect to the limit of two pawnshops in each councilmanic district, it cannot be stated with absolute certainty that that limitation was not considered by the Board of Appeals in 1997. Captain Johnson, in his testimony before the Board, did make mention of the negative impact of "a third pawnshop in the 11th precinct." The Board itself made reference to the fact that there were already "two existing pawnshops in this vicinity." The issue was not moot when raised in the first appeal to this Court.

Even if the issue were not moot in 1997–99, however, it has since become so. It was County Council Bill No. 112–95, passed on June 5, 1995, that enacted what became BCZR 436.4A, which provides that a pawnshop

[l]ocation may not be within a one-mile radius of any other pawnshop, *and no more than two pawnshops may be located in a councilmanic district.*

(Emphasis supplied).

Our entire opinion of July 21, 1999, dealt with the applicability to that section of Section 6 of Bill No. 112–95, the "grandfather" provision, which stated:

AND BE IT FURTHER ENACTED, that pawnshops lawfully in existence and operating on the effective date of this Act *are not subject to the requirements of Sections 436.4.*

(Emphasis supplied).

The single issue dealt with in our 1999 opinion was that the "grandfather" provision of Section 6 exempted existing pawnshops that were in the act of relocating from the locational limitations of § 436.4A. The exemption applied to the two-pawnshops-per-councilmanic-district-limitation as surely as it applied to the one-mile-radius-limitation. We held that the very limitation which the appellees now claim is unconstitutional did not apply to the appellees.

The Board of Appeals, on remand, complied with our opinion in every way. The Board's decision of December 19, 2000, was based exclusively on *Schultz v. Pritts* factors. Neither of the inapplicable locational limitations were factors in that

decision. They were not even mentioned. The Baltimore County "cap" of two pawnshops per councilmanic district, whatever its constitutional merit or demerits, had absolutely nothing to do with the ultimate denial of the special exception in this case. This final contention is, therefore, moot.

**JUDGMENT OF THE BALTIMORE COUNTY CIRCUIT COURT REVERSED AND RULING OF THE BALTIMORE COUNTY BOARD OF APPEALS AFFIRMED; COSTS TO BE PAID BY APPELLEES.**