880 A.2d 1118

**Edward S. TOCHTERMAN, Jr.**

v.

**BALTIMORE COUNTY, Maryland.**

**No. 1125, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 6, 2005.

Reconsideration Denied Sept. 8, 2005.

386

J. Carroll Holzer (Holzer & Lee, P.A., on the brief), Towson, for Appellant.

James J. Nolan (Baltimore County Law Office, on the brief), Towson, for Appellee.

Panel: ADKINS, SHARER, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

If there is one overarching principle of administrative law, it is that the courts should never lose sight of the separation of

powers doctrine when, periodically, they are asked to intervene in the operations of a separate and equal branch of government. An employee of the Baltimore County government, unhappy at his non-consensual lateral transfer, had available to him an established grievance procedure, with three levels of review, within the executive branch of government. Only when he failed to prevail at any of those levels did he ask the judicial branch to intervene. Failing again at the circuit court level, he has appealed to this Court. As we accept this or any other administrative appeal, we must be poignantly sensitive 1) to the need to resist the temptation to behave as an imperial judiciary and 2) to the institutional deference we owe to the executive branch of government. An administrative appeal is not simply a routine appeal from lower down the ladder of our own judicial branch.

## Procedural History of the Case

At the time of the action which is the subject of this appeal, the appellant, Edward S. Tochterman, Jr., had been an employee of Baltimore County, the appellee, for twenty-nine years. The appellant, who first came to work for the County in September of 1974, served as the Bureau Chief of the Bureau of Building and Equipment Services in the Department of Public Works from May of 1995 until November of 2002. In November of 2002, he was transferred to the position of Management Assistant IV in the Department of Recreation and Parks.

Unhappy at being transferred, the appellant, on November 20, 2002, followed the established grievance procedure set up for employees of the Baltimore County government and submitted two separate grievances to the Director of Public Works, Edward J. Adams. After meeting with the appellant on December 11, 2002, Mr. Adams denied both grievances.

The appellant then appealed that decision of Mr. Adams to the County Administrative Officer. A meeting was held between the Administrative Officer and the appellant on January 8, 2003. On January 17, the Administrative Officer issued a seven-page written decision, denying the grievances.

The appellant further appealed that decision to the Personnel and Salary Advisory Board ("PSAB"). A hearing was held before the PSAB on April 16, 2003, with the appellant being represented by counsel. Nine witnesses gave testimony, five for the appellant and four for the County. On May 7, the PSAB issued its seven-page Order, also denying the grievances and upholding the decision of the Administrative Officer.

The appellant filed a petition for judicial review in the Circuit Court for Baltimore County. Following a full hearing on March 23, 2004, Judge J. Norris Byrnes, on July 12, 2004, issued a well reasoned, seven-page Order affirming the decision of the PSAB. This appeal followed.

## The Issue

On this appeal, the appellant raises six questions:

1. Did the PSAB err in its findings that Baltimore County had the authority to remove the Appellant from his position of Bureau Chief pursuant to the alleged "emergency conditions" as set forth in Personnel Regulations 9.01; § 25–126 and § 25–9(b) of the County Code?

2. Did the Circuit Court err in affirming the PSAB in light of its finding that the words "emergency conditions" encompass emergencies such as natural disasters which require employee transfers on a temporary basis and was not intended as a catch-all to provide unlimited authority and contradiction of regulations set forth to resolve disciplinary action? Did the Court err by then affirming the action of the PSAB?

3. Did the PSAB err in its findings that "no employee has a legal entitlement to any specific position?"

4. Did the PSAB err in its findings that the County Code and Charter permit part-time employees to serve in a supervisor capacity?

5. Did the PSAB err in its finding that the County did not violate Tochterman's rights afforded to him under the County Classified System when he was not interviewed for the position of Bureau Chief?

6. Did the PSAB err by failing to address the question presented to them by the Appellant that in replacing the Appellant, the County acted illegally in soliciting the applications for a position that was still occupied by the Appellant?

We decline to frame the issue (or issues) before us as the appellant has done. The profligate proliferation of closely related issues serves only to trivialize the core question and to distract attention from it. We are not marking the PSAB's paper or deciding whether it lapsed into inartful phraseology or inapt characterization, and we do not intend to parse every sentence of the PSAB opinion as if we were exegizing a sacred text. Our only concerns are 1) whether Baltimore County had the authority to transfer the appellant from one position in the Baltimore County government to another position of comparable rank and salary and 2) whether the County properly executed that authority. If so, the PSAB had, as a matter of fact, a substantial basis for deciding as it did, and we, affirming, will be content.[1]

### The Factual Background

The appellant, as a bureau chief, bore the primary responsibility for seeing that his bureau was a smoothly operating branch of the Baltimore County government. Beginning in November of 2001, however, unrest and discontent became rampant in the upper echelons of the appellant's bureau. The appellant himself was at the very vortex of that unrest. The bureau itself was divided into three main divisions. The three division managers, in theory, reported directly to the appellant. By May of 2003, the appellant was in a state of virtually

---

1. The latter three contentions, for instance, are totally extraneous to the issue before us. If the appellant prevails on his core contention that he was improperly transferred, the last three contentions are both redundant and beside the point. If, on the other hand, we decide that the appellant's transfer was proper, questions about how the County went about filling his vacancy, both on a part-time basis and on a long-term basis, are of no special concern to this appellant. They are questions that he has no standing to raise. Judge Byrnes characterized these issues as "non-starters." We fully concur.

open warfare with two of his three division managers and the working environment of the entire bureau was in a shambles. As a universal management principle, when a crew is in open revolt, it is the captain who is deemed to bear the ultimate responsibility.

In his opinion and order, Judge Byrnes described the employment environment in the bureau at the time that Mr. Adams, as Director of Public Works, found it necessary to intervene.

[T]here was ample evidence that in 2001 through 2002 *Petitioner exhibited very poor behavior and displayed very poor judgment. Mr. Adams characterized his behavior as having resulted in "continuing unrest" and a "poor work climate" within the Bureau.* The record reflects that there had been *a number of employees* that *were complaining about Petitioner's management style.*

(Emphasis supplied).

The rupture in a healthy working relationship spread downward in at least three directions from the appellant to his immediate executive staff and, arguably, in one direction upward to his own immediate superior, Mr. Adams.

## 1. Discord With The Building Operations Manager

Ada Peggy Spriggs, as Building Operations Manager, was one of the three managers working directly with the appellant. Trouble between the appellant and Ms. Spriggs began in November of 2001. Judge Byrnes's opinion described the initial breach.

In November of 2001, Ada Peggy Spriggs, the Building Operations Manager, made a telephone call to Joann F'Amolaro, an employee in the Bureau's Glen Arm office. During this conversation, she apparently made reference to the fact that Petitioner's secretary had received a promotion "on her knees." This comment was overheard by another employee and was repeated to Petitioner, who became quite upset. Petitioner brought this to Mr. Adams' attention and

attempted to have Ms. Spriggs demoted and transferred from the Bureau.

At that point, the appellant's legitimate complaint was properly placed in the hands of Mr. Adams. Mr. Adams determined that Ms. Spriggs had, indeed, been guilty of making an inappropriate comment and he imposed on her the sanction of a five-day suspension without pay. In his testimony before the PSAB, Mr. Adams described his reasoning process in trying to determine an appropriate sanction.

I tried to come up with a punishment—*I tried to come up with discipline that I considered reasonable.* And I was not alone in this issue. Due to the level that it was occurring, this is probably the senior African American woman in the work place, as far as pay rate, supervision, definitely in Public Works. I don't know about the County.

Many people do know her. So, *I wanted to make sure that I was doing the right thing. I consulted with the Office of Law, I consulted with the Budget Office, I consulted with Personnel, I consulted with the previous Director.*

Ted made a comment to me at one time that he thought Bob Olson would do something different. I informed him that I did consult with Mr. Olson and, in fact, he suggested that he would have probably have done a three day. And this was prior to me instituting a five day suspension.

The way I look at it, the lady, *Ms. Spriggs,* she *basically lost a week's worth of pay, a week's worth of time for making a comment. Inappropriate. And we need to pick up from there and keep going forward.*

Q. Did you make that decision—you actually made that final decision?

A. *That decision is mine to make.* I did have—I'm not saying that I didn't consult with somebody else. No one else told me to do that. There was a range of suggestions. *The five days is what I felt comfortable with. The five days is what I felt is appropriate and would stick.*

(Emphasis supplied).

That should have ended the matter. The problem lay not with the appellant's initial complaint about Ms. Spriggs (it was

legitimate), but with his adamant refusal to accept the fact that she was to be punished by a five-day suspension rather than by being removed from the bureau, as he wished. He emotionally refused to accept the final decision made by the appropriate authority. If one were to sum up this case in a single sentence, it would be that Ms. Spriggs became for the appellant an *idee fixe* that he could not thereafter see beyond. That obsession was ultimately self-destructive. In its decision, the PSAB described how the appellant allowed his resentment at what he deemed to be an inadequate punishment to fester and, ultimately, to poison the larger work environment for which he was responsible.

> While it is clear that all of the responsibility cannot be fairly placed upon the Appellant for all of these concerns, *the Appellant was the manager in charge and, as such, has a direct responsibility to find a way to resolve or effectively work around concerns and/or problem employees. The Appellant failed to do this specifically with regard to his work relationship with Spriggs.* It is apparent that neither the Appellant nor Spriggs liked or respected each other. *While it is understandable that the Appellant could be upset with the remark that Spriggs made to Famolaro, the record suggests that his reaction was far stronger and more sustained than a reasonable person might have in a similar situation.* Activities undertaken by the Appellant consistent with his reaction continued even after Adams had moved to address the Appellant's concerns about having to deal with Spriggs by transferring supervisory responsibility for her from him to Sproles.
>
> Had this course of conduct been confined solely to Spriggs, it would have been disruptive to the workplace but the *Appellant's continued focus on the situation had serious consequences on the workplace overall and on a number of other employees.*

(Emphasis supplied).

Judge Byrnes's opinion referred both to this progressively deteriorating relationship between the appellant and Ms.

Spriggs and also to the breach in a good working relationship between the appellant and his own supervisor, Mr. Adams.

> After considering Ms. Spriggs' twenty-three (23) year employment, *Mr. Adams* concluded that Petitioner's request was inappropriate, and he instead *imposed a five-day suspension. Petitioner never fully accepted Adams' decision. Petitioner was even childish enough to refuse to speak to Mr. Adams without having his attorney present.* To show his displeasure at Mr. Adams' decision, *Petitioner refused to evaluate Ms. Spriggs.* In Petitioner's February 13, 2002 memo to Mr. Adams, *Petitioner again complained that Mr. Adams was negligent in the manner in which he had disciplined Ms. Spriggs.*

(Emphasis supplied).

### 2. Discord With The Account Clerks

In May of 2002, a delegation of two account clerks and Joann F'Amolaro, a management assistant, also came to Mr. Adams and complained that the appellant was bullying them and they felt as if they were being subjected to a hostile work environment. The order and opinion of the PSAB summarized Ms. F'Amolaro's testimony.

> *She described the Bureau when the Appellant was there as a hostile and oppressive environment. She described the Appellant as being on a power trip* and interested in causing dissension and dividing people.

(Emphasis supplied).

### 3. Discord With The Equipment Maintenance Manager

Another of the three managers working directly under the appellant was Arthur K. "Bud" Sproles, the Equipment Maintenance Manager. When the appellant refused to have anything further to do with the supervision of Ms. Spriggs, that supervisory responsibility was reassigned to Mr. Sproles. The reassignment was not without strings attached. The PSAB opinion and order summarized his testimony with respect to how the appellant had instructed him to handle Ms. Spriggs.

He indicated that he was aware of tension and other problems within the Bureau beginning sometime in 2000–1. Sproles stated that *the Appellant told him that he should not support or assist Spriggs and that he should let her fail.*

(Emphasis supplied).

### 4. Discord With The Building Maintenance Manager

According to Mr. Adams, the "straw that broke the camel's back" was the May 23, 2002 confrontation between the appellant and Ray Reider, the Building Maintenance Manager, the third of the appellant's division managers. That development was particularly compelling to Mr. Adams because Ray Reider "is someone, I view, as being very loyal to [the appellant]." In his testimony before the PSAB, Mr. Adams took special note of the theretofore close relationship.

> Basically, *when I heard about what he did to Ray Reider,* straight from Ray Reider, and Ray Reider was willing to testify to it . . . *I knew I had to react.*
>
> . . . .
>
> . . . *Ray was extremely loyal to Ted, extremely loyal to Ted.*
>
> And I would not react unless Ray was willing to tell me that this is what happened to him.

(Emphasis supplied).

The PSAB opinion and report summarized the testimony of Ray Reider.

> Reider stated that *in 2002 that relationship changed. He described times when he drove Spriggs to County buildings as situations where both of them were going to the same or many of the same locations;* regarding the May 23, 2002 incident, Reider stated that he drove Spriggs because she appeared to be too visibly upset to drive; he linked this condition to concerns that Spriggs had because her mother was very sick. He recalled a request from Adams to meet with him about the incident with the Appellant; this occurred about 3 weeks after the incident. *He recalled being instructed by the Appellant that he should not support*

*Spriggs and the Appellant told him that he would find out if support were given to her.* He described himself as fearful of doing the wrong thing, of incurring the Appellant's adverse reaction, of potential violence in the workplace and of losing his job. Because of this incident, he stated that *he did not speak to the Appellant for 3 weeks. The witness believed that the Appellant was setting Spriggs up for failure. Reider indicated that the Appellant's rocky relationship with Spriggs had progressed from a work level to a personal level.*

(Emphasis supplied).

Judge Byrnes also characterized the reaction of the appellant to the fact that Reider had given a ride to Ms. Spriggs.

In Mr. Adams' words, *"the straw that broke the camel's back" occurred when Ray Reider,* a highly-rated Building Maintenance manager, *gave Ms. Spriggs a ride to the east side of the County.* Both Mr. Reider and Ms. Spriggs were traveling on County business. *When Petitioner found out about this, he called Mr. Reider, demanded that he report to the Glen Arm office, and gave him a brow beating in the presence of another employee. Mr. Reider became physically ill as a result of the incident,* and experienced stress in subsequent weeks.

(Emphasis supplied).

At that point, the appellant's relationship with one of his three division managers (Ms. Spriggs) was non-existent, was severely damaged with a second (Reider), and was to some extent compromised with the third (Sproles).

It was the appellant's excessive reaction to Reider that convinced Mr. Adams that immediate action was necessary. He testified:

The thing that really drove me was *I've had this organization that's basically been misfiring* and I can't get it right. I can't get it right.

*Management is just not clicking up there with the office staff and there's a big problem.* Again, it was an organization that functioned so well for a good period of time.

. . . .

Now I had to give that a whole lot more validity. It was no longer an issue of, "Was this just simply a female jealousy issue in the work place?" And based on that, and based on the fact that it had gone on for so long, *I did make the decision* along with counsel—I'm talking the counsel of my peers in the administration, personnel, and based on Ted's years of service, we did make the move *to transfer Ted.*

*Not fire him, not discipline him, but transfer him to another department.* And this is the way it was explained to him, was to get a fresh start for him and fresh start for this Bureau.

(Emphasis supplied).

### The Appellant Was Fully Apprised Of Official Concern Over His Job Performance

In "beweep[ing] his outcast state," [2] the appellant describes himself as one who, completely unaware of trouble in the wind, was suddenly "blindsided" by his unexpected transfer. Treating that transfer as if it were, *ipso facto,* a "disciplinary action" pursuant to § 25–15 of the County Code—notwithstanding the fact that he was neither dismissed from employment pursuant to subsection (a), nor demoted pursuant to subsection (b), nor suspended without pay pursuant to subsection (c)—he complains that he received 1) no "reasons or charges, stated in writing" for the transfer; 2) no warning that his superiors were unhappy with his performance; and 3) no opportunity to correct the situation. He claims that he was denied the due process guaranteed by § 25–15 before discipline can be imposed. In his brief, the appellant states:

[The appellant] then testified that *he had never been criticized by Director Adams,* never given an order that he did not follow, *never been* disciplined or *counseled in any way. Adams never indicated the he was ever dissatisfied with*

---

**2.** Shakespeare, Sonnet XXIX.

> *Tochterman's performance or the Bureau's performance.*
> *Tochterman was never advised that Adams was not happy*
> *with the way he was running the Department.*

(Emphasis supplied).

The appellant "doth protest too much" for that is just not the case. Quite aside from the fact that a lateral transfer is not a disciplinary action pursuant to § 25–15, the appellant was, in indisputable fact, not caught unaware. He was not notified of his transfer until June 14, 2002. The apparent trigger for the managerial implosion that ultimately caused the transfer, the overheard telephone call by Ms. Spriggs to Joann F'Amolaro, had occurred on November 2, 2001, seven months earlier. Mr. Adams's decision to impose a five-day suspension without pay on Ms. Spriggs was announced by him in February of 2002.

Edward Adams had become the Director of Public Works, and the·immediate supervisor of the appellant, in July of 2000. From the outset of that relationship, Adams was alerted to problems in the appellant's bureau involving 1) the account clerks and 2) pervasive resentment in the ranks about allegedly favored treatment given by the appellant to his secretary. Before the PSAB, Adams described both the problems themselves and his confronting of the appellant about the problems.

> When I took over as Director, *it became apparent to me that there were some issues.* [T]here had been testimony to describe them, some of the *female jealousy issues that were prevalent in the office staff.*
>
> ... The account clerks, I did get involved because people asked me to get involved. *I wanted to find out what was going on up here in this shop where these individuals were bickering with each other* and more or less going after each other....
>
> Q Did you identify any particular problem that needed to be addressed or that you thought may be causing the situation?
>
> A There was no doubt that there was this underlying element that *many of the staff, including several of his*

*closest advisors* and people that he worked with, *did point to the issue that he gave specialized treatment to Jeane Ahmer, his secretary.*

The testimony of Ms. Joann F'Amolaro was something I had heard previously in regards to three, four hour counseling sessions when they could not get into the room. *I did ask Ted about that, question you know, you understand that this rumor is out there about you and Jeane.* You know, why are you sitting—he said it was perfectly appropriate for a supervisor to be counseling a subordinate, and he felt it was part of his job duties. *That was the response that he gave to me.*

. . . .

A This is part of the underlying current that was going on. Again, *the account clerks or other office staff—they felt that, even though Ted was the Bureau Chief, Jeane was calling the shots through Ted.*

. . . Or *I would actually talk to Ted and ask him, he mentioned he talked with the account clerks. That was something I asked him to do.*

They felt that they had been shut out by him completely. And the account clerks and Joann, they just basically wanted to be able to talk to him again. They could not go into the room again, it was that underlying current that Jeane just basically got everything she wanted.

(Emphasis supplied).

As a result of ongoing discussions between them, it was obvious to the appellant that Adams was concerned about widespread unrest and resentment within the bureau's top managerial staff resulting from the perception that the appellant was showing favoritism toward his secretary and extending preferential treatment to her.

The fall-out from the overheard telephone conversation of November 2, 2001, was not one-directional. Ms. Spriggs filed a complaint against the appellant with the Office of Fair Practice. Several other employees of the bureau were threatening to file similar complaints against the appellant. The

dramatic rupture in the relationship between the appellant and his supervisor, Adams, occurred, however, when the appellant refused to accept what he deemed to be the overly lenient sanction imposed on Ms. Spriggs. Adams and the appellant had several conversations in Adams's office about the sanction.

After the appellant filed several memoranda, one of which referred to the discipline deserved by Ms. Spriggs as having been "negligently not administered to her," Adams attempted to meet with the appellant but was rebuffed. He testified:

Q Now, having received that second memorandum *did you ask Ted that you wanted to speak to him?*

A *Yes, I did.*

Q And what was his response?

A *His response was he would not speak to me unless he had a lawyer present.*

(Emphasis supplied).

Adams conferred with the County Law Office and was reassured that the appellant had no such right not to meet with him on matters concerning the operation of the bureau.

[T]he Law Office basically informed me that he has no rights to attorney when we're talking a business issue, the running of the Department.

Ms. Spriggs was on leave and Adams had to know how the appellant intended to deal with her upon her imminent return to work.

[T]he key thing *I needed* was *to get him into the office to discuss,* you know, *Peggy's first day back and how we were going to handle this.*

... I fully expect people to get upset with certain decisions that they may not like. But I also expect them to get over it so we can move forward.

Again, I did give him some breathing time, but *I needed to have a meeting prior to Peggy's return to work.* That's what I was trying to set up.

Q Did you have that meeting?

A Yes, sir. I think the date here is February 19th.
(Emphasis supplied).

At that meeting, the appellant stated he refused to supervise or evaluate Ms. Spriggs, although she was one of his three division managers. It was agreed that Arthur "Bud" Sproles, another of the three division managers, would assume that responsibility. Also present at that meeting with the appellant was Tom Hamer, the Deputy Director of Public Works. A brief colloquy at the PSAB hearing shed light on Adams's concerns.

BOARD MEMBER: Can I ask a question. *He refused to do the performance evaluation; is that correct?*

THE WITNESS: *Yes, sir.*

BOARD MEMBER: *Why at that point didn't you consider that insubordination on his part?*

THE WITNESS: *At one level I could,* but at the other level I'm also trying to work with an employee-=-a valued supervisor over the years that—*I'm just trying to get us back on to the right track.* I guess I'm saying I'm trying to pick my battles.

(Emphasis supplied).

Adams conferred with the appellant about the future of the bureau and about the dissension that was disrupting it. The appellant's only suggested strategy was to "purge" the people with whom he could not get along.

At that point in time *we talked about the future and the fact that the purge is where he felt the Bureau needed to go.* In other words, to make this Bureau better for the Director for Baltimore County, I need to purge certain individuals. Specifically he did name Peggy Spriggs, Joann F'Amolaro and a couple of the account clerks.

Q *Did he specifically use that word, purge?*

A *Yes, that was his word, that is not mine.* And, again, Tom Hamer reviewed these before I signed them, too

(Emphasis supplied). Judge Byrnes referred to the appellant's projected purge of his bureau as a "vendetta."

Adams and the appellant discussed how personal relations within the bureau that had once been good had so sadly deteriorated.

I asked Ted at that time, and I've always been asking this question even as late as having the grievance hearing a couple months ago. *What happened to the personnel staff between '95 and '98 when you managed to gain the respect and admiration of the staff versus the past two years when several of these same individuals needed to be purged?*

*I never really could get a direct answer from him* because (inaudible) he did make the statement of female jealousy within the office staff. And, again, that's something that seemed to have come out a lot since Jeane got there.

(Emphasis supplied).

With respect to a prognosis for the bureau's future, it was the appellant's firm opinion that the situation was going to get worse, not better.

*His thing* on that *was, If you think it's going to go away, it's not. Three years it's going to be in Circuit Court.* Some comment in regards to that.

I did ask him at that time, are you talking about suing the County, [or] myself? He was a little hesitant on that. He really didn't give a specific answer. Based on that comment, based on my concerns from him making the comment with the Circuit Court, I did have further conversation with the Law Office just to review the situation and make sure that we were doing everything appropriate or I was doing everything appropriate for the sake of Baltimore County.

(Emphasis supplied).

At the appellant's request, that meeting of February 19, 2002, was memorialized by a memorandum.

Q All right. So you had this meeting and as a result then *you sent a memorandum to Ted which is dated February 20th; is that correct?*

A *Yes, sir. . . . Ted asked for it to be in writing.*

Q So you told him at the meeting that's what was going to happen?

A Yes. *It's written in the notes, but he wanted it in writing.*

Q And this is a written confirmation of what had been decided and told to Ted at the meeting?

A Yes, sir.

(Emphasis supplied).

In May of 2002, two of the account clerks and Joann F'Amolaro complained to Adams about the appellant. Adams met with the appellant to discuss that issue.

So *I did go up and meet with Ted* and *I said,* you know, they're coming in. *Things seem to be stirring up again* now, you know, after having about a month of peace. I was like, *they feel that you are shutting the door on them.*

*Ted did meet with them that day. That day or the next day, I can't remember.* But he scheduled it very quickly, *I asked him how that went.* One individual . . . said she liked the fact that he had to let her in the office so that they could have at it.

And she basically let him know how she felt about certain issues. *The other two basically felt it was almost totally useless because whatever they were saying was happening he was either denying or he had reasons or he was questioning their issue as not being relevant* or something like that.

So the other two were not happy at all. But, again, the thing that stuck in my mind that day was the issue that *they felt that they had retribution coming if they were seen working with or even saying hello to Peggy or being seen in her sight.*

This idea that it's them against me.

(Emphasis supplied).

Our point in recounting this series of ongoing conversations and meetings between the appellant and his supervisor, Adams, over a period of many months is that it is completely

disingenuous for the appellant to remonstrate 1) that he was blissfully unaware that his superiors were disturbed about his performance as bureau chief, 2) that he was never put on notice about any official concern, and 3) that he was never given an opportunity to rectify the problem. Because the lateral transfer was not, in any event, a disciplinary action pursuant to § 25–15, the issue of lack of notice has no critical significance. It is nonetheless important, we feel, to place our decision in an accurate factual context.

### The PSAB's Decision

The final decision of the PSAB, affirming the decision to transfer the appellant, was very clear.

*The County must maintain the ability to ensure that its operations are effectively managed and must be able to take appropriate personnel actions to support that mandate. Adams believed* that he had problems in the Bureau's operations. He believed that the Appellant was directly involved in those problems and, in fact, *that the Appellant was directly involved with the Spriggs issue, had led to the unacceptable treatment of Reider, a long-time manager with an excellent work history as well as a history of support and loyalty to the Appellant.* Sufficient evidence exists in the record to support Adams' decision to remove the Appellant and to transfer him to another position without any initial loss of pay or benefits.

Lastly, the Board agrees with the County position that *this was not a disciplinary action, therefore, the concept of progressive discipline does not apply.* The Board also notes that *no employee has a legal entitlement to any specific position.*

(Emphasis supplied).

### The Decision Being Reviewed

■ Although this appeal is literally from the decision of the circuit court, it is actually the earlier decision of the PSAB that we must review. In *Pollard's Towing, Inc. v. Berman's*

*Body Frame & Mechanical, Inc.*, 137 Md.App. 277, 287, 768 A.2d 131 (2001), we observed:

At the outset, *let it be clear whose decision is being reviewed and by whom.* The review on the ultimate merits is now being conducted by this Court. *We are not reviewing the procedural correctness of the earlier review by the circuit court. We are undertaking our own de novo review of the decision of the administrative agency. . . .*

The decision of the circuit court, therefore, is before us only in a *pro forma* capacity, as the necessary procedural conduit by which the decision of the administrative agency gets to us for our review.

(Emphasis supplied).

As we explained in *People's Counsel v. Country Ridge*, 144 Md.App. 580, 591, 799 A.2d 425 (2002), we are looking not *at* the circuit court decision but *through* it.

Although the judicial act being appealed to us is literally the June 13, 2001 ruling of the Baltimore County Circuit Court, our review will look not so much *at* the circuit court action as *through it* to the December 13, 2000 decision of the Baltimore County Board of Appeals.

(Emphasis in original).

In *Department of Health and Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994), Judge Motz wrote to the same effect.

Moreover, it is well recognized in Maryland that, *when reviewing administrative decisions, the role of an appellate court is precisely the same as that of the circuit court. See, e.g., Baltimore Lutheran High Sch. Ass'n, Inc. v. Employment Security Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985) ("A reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test").

(Emphasis supplied).

## The Standard of Review

We turn now to the standard of appellate review that we shall apply to the decision of the PSAB. As will be discussed

more fully, a critical determination in this case will be whether the situation facing the appellant's superiors, when they ordered him to be transferred, constituted an "emergency condition" within the contemplation of Baltimore County Code, Regulation 9.01. This is not a legal question. There is no statutory definition provided of "emergency conditions." Nor is there caselaw on the subject. There is no dispute as to what the county administrative officer may do when "emergency conditions" are, in fact, present. There is only a factual question of whether there was, in fact, an emergency condition under the circumstances in this case. The PSAB found that there was. We are called upon to review the permissibility of that finding, to wit, whether there was substantial evidence to support such a finding.

In *Stover v. Prince George's County,* 132 Md.App. 373, 381, 752 A.2d 686 (2000), Judge Kenney explained that the standard of review is the substantial evidence test, a test that calls both for appellate deference and for appellate discipline. It matters not whether we think the circumstances constituted an emergency condition, so long as there was some substantial basis for the PSAB to have concluded that they did.

> Rather, "[t]o the extent the issues on appeal turn on the correctness of an agency's findings of fact, *such findings must be reviewed under the substantial evidence test." Department of Health and Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citation omitted). *The reviewing court's task is to determine "whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions." Maryland Commission on Human Relations v. Mayor and City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). *The court cannot substitute its judgment for that of the agency, but instead must exercise a "restrained*

*and disciplined judicial judgment so as not to interfere with the agency's factual conclusions."*

132 Md.App. at 381, 752 A.2d 686 (emphasis supplied).

In *Eberle v. Baltimore County,* 103 Md.App. 160, 166, 652 A.2d 1175 (1995), Judge Alpert explained:

This court recently reiterated the standard for appellate review of administrative agency decisions in *Hill v. Baltimore County,* 86 Md.App. 642, 659, 587 A.2d 1155, *cert. denied,* 323 Md. 185, 592 A.2d 178 (1991). When reviewing the factual findings of administrative agencies, it is the court's duty to determine whether the agency's decision was supported by substantial evidence. *Id.* In applying this "substantial evidence" standard, *the reviewing court must determine "whether a reasoning mind reasonably could have reached the factual conclusion that the agency reached." Id.* (quoting *St. Leonard Shores Joint Venture v. Supervisors [Supervisor] of Assessments of Calvert County,* 307 Md. 441, 447, 514 A.2d 1215 (1986)). *A court "must not engage in judicial fact-finding or substitute [its] judgment for that of the agency." Id.* (citing *St. Leonard Shores,* 307 Md. at 447, 514 A.2d 1215). Thus, we must examine the record to determine if there was substantial evidence from which a reasoning mind reasonably could have come to the factual conclusions reached by the Board of Appeals.

(Emphasis supplied).

In *Hill v. Baltimore County,* 86 Md.App. 642, 657, 587 A.2d 1155 (1991), Judge Rosalyn Bell similarly observed:

When reviewing the decisions of an administrative agency, we must determine whether they are supported by substantial evidence. In this regard, our duty is to determine " 'whether a reasoning mind reasonably could have reached the factual conclusion that the agency reached.' " *St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert County,* 307 Md. 441, 447, 514 A.2d 1215 (1986) (citations omitted). *In applying this standard, we are mindful that we must not engage in judicial fact-*

*finding or substitute our judgment for that of the agency.
St. Leonard Shores,* 307 Md. at 447, 514 A.2d 1215.

Our review of the record convinces us that *there was
relevant and substantial evidence to support the conclusion
of the Board* of Appeals.

(Emphasis supplied).

As the standard for reviewing decisions of administrative
agencies, the substantial evidence test is also frequently re-
ferred to as the "fairly debatable" test. In *Neuman v. City of
Baltimore,* 23 Md.App. 13, 14, 325 A.2d 146 (1974), Judge
Gilbert pointed out:

> The general rule is that *the action* of a zoning board *will
> not be reversed on appeal if there is "substantial evidence"*
> in the record *to support the board's finding. Luxmanor
> Citizens v. Burkart,* 266 Md. 631, 647, 296 A.2d 403 (1972).
> *If such evidence does exist* in the record, *the matter is
> considered to be "fairly debatable", and the courts may not
> substitute their judgment for that of the board* which is
> presumed to exercise a degree of expertise in zoning. *Ag-
> neslane Inc. v. Lucas,* 247 Md. 612, 233 A.2d 757 (1967);
> *Board v. Oak Hill Farms,* 232 Md. 274, 192 A.2d 761 (1963);
> *Largo Civic Ass'n v. Pr. Geo's Co.,* 21 Md.App. 76, 90, 318
> A.2d 834 (1974). On the other hand, where the action of the
> board is not supported by substantial evidence the board's
> decision cannot be said to be "fairly debatable". Under
> those circumstances the board's finding falls into the catego-
> ry of being arbitrary, capricious and a denial of due process
> of law.

(Emphasis supplied).

This Court further elaborated on the "fairly debatable"
standard in *Mortimer v. Howard Research,* 83 Md.App. 432,
441, 575 A.2d 750 (1990):

> In making a determination of whether the Board of Appeals
> decision is arbitrary, illegal or capricious, the reviewing
> court must decide whether the question before the agency
> was fairly debatable. *Howard County v. Dorsey,* 45 Md.
> App. 692, 700, 416 A.2d 23 (1980), *rev'd on other grounds,*

292 Md. 351, 438 A.2d 1339 (1982). *An issue is fairly debatable if reasonable persons could have reached a different conclusion on the evidence and, if so, a reviewing court may not substitute its judgment for that of the administrative agency.* Eger v. Stone, *253 Md. 533, 542, 253 A.2d 372 (1969).* The fairly debatable test is analogous to the clearly erroneous standard under Rule 8–131(c) and a decision is fairly debatable if it is supported by substantial evidence *on the record taken as a whole.

(Emphasis supplied).

As Judge Eldridge pointed out for the Court of Appeals in *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 513, 390 A.2d 1119 (1978):

[D]ecisions of administrative agencies are prima facie correct and carry with them the presumption of validity.

See also *Hoyt v. Police Commissioner,* 279 Md. 74, 88–89, 367 A.2d 924 (1977); *Dickinson–Tidewater, Inc. v. Supervisor,* 273 Md. 245, 256, 329 A.2d 18 (1974); *Heaps v. Cobb,* 185 Md. 372, 378, 45 A.2d 73 (1945).

In *Friends of the Ridge v. BG & E,* 120 Md.App. 444, 466, 707 A.2d 866 (1998), Judge Harrell clearly set out for this Court the mandatory dictates of the deference requirement.

If such substantial evidence exists, *even if we would not have reached the same conclusions as the Board* based on all of the evidence, *we must affirm.* Stated another way, *substantial evidence pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion.*

(Emphasis supplied).

■ In *Eastern Outdoor Advertising v. Mayor and City Council of Baltimore,* 128 Md.App. 494, 514, 739 A.2d 854 (1999), this Court also made it emphatically clear that our mandate to accept findings of fact based on substantial evidence applies as well to conclusions on mixed questions of law and fact.

*When reviewing* findings of fact and *conclusions regarding mixed questions,* however, *the circuit court* "cannot substitute its judgment for that of the agency and *must accept the agency's conclusions if they are based on substantial evidence* and if reasoning minds could reach the same conclusion based on the record."

(Emphasis supplied). See also *Travers v. Baltimore Police Dept.,* 115 Md.App. 395, 420, 693 A.2d 378 (1997) ("*When a reviewing court examines the manner in which an agency applied law to facts,* which is a judgmental process involving a mixed question of law and fact, *great deference must be accorded to the agency.*") (emphasis supplied).

### The Legitimacy of a Lateral Transfer

Baltimore County Code, § 25–1 *et seq.* is the "Personnel Law of Baltimore County." Section 25–126 deals with "Personnel rules and regulations," and Rule 9 thereof concerns "Transfers." Our immediate concern is with Regulation 9.01, which provides:

The county administrative officer may cause employees in the classified service to be transferred within or between county agencies to meet workload peaks or emergency conditions except that no employee in the merit system may be transferred out of the classified service without the employee's consent in writing.

Although it is not within our province (or competence) to legislate for Baltimore County, our reading of Rule 9 makes it appear to us that the rule is strangely incomplete. Regulation 9.01, for example, expressly authorizes transfers, without employee consent, under two very particular circumstances. At the other end of the spectrum, it expressly forbids such a transfer, not under all other circumstances (as the appellant would have us interpret the provision) but under one particular circumstance, to wit, "out of the classified service." Between the two instances expressly authorized and the one instance expressly forbidden lies a vast middle ground, as to which Regulation 9.01 is cryptically silent. Section 25–9(b) of the Baltimore County Code also provides:

Notwithstanding any other provision of this title, *the personnel rules and regulations shall permit the County Administrative Officer to cause employees to be transferred* within or between County agencies *to meet* workload peaks or *emergency conditions.*

(Emphasis supplied).

Regulation 9.02 goes on to deal with lateral transfers that are actually requested by the employee. It also recognizes the critical criterion that should guide the decision of the director of human resources, as it provides that he may authorize the transfer "if he deems such transfer to be for the good of ... the service." Regulation 9.03 then deals with what it refers to as "a horizontal transfer" upon the recommendation of a department head. It conditions such a transfer upon the employee's "consent[ing] to the change, in writing."

But what of a transfer that the director of human resources deems to be "for the good of the service" but which the employee has neither requested or consented to? Is everything not expressly permitted, forbidden? Or is everything not expressly forbidden, permitted? What about a lateral transfer, not "out of the classified service" and not punitive in nature, which seems to the county administrative officer to be compellingly necessary for some reason other than a "workload peak" or an "emergency condition"? What if there is an excess or redundancy of talent in one overstaffed bureau and a need for more extraordinary leadership in another bureau? Is the leadership of county government incapable of responding because it is paralyzed by its classified service rules? It is incomprehensible that that should be the case.

In any event, it is not necessary for us to fill the gap that lies between those actions that are expressly permitted and those that are expressly forbidden. In ruling that the appellant's lateral transfer was a legitimate exercise of the governmental powers conferred by § 25–9(b) and Regulation 9.01, the PSAB implicitly found that the Acting County Administra-

tive Officer was acting in response to an "emergency condition."

## When Is An Emergency An Emergency And Who Is To Say?

 A convenient way out of the dilemma posed by the gap between that which is expressly permitted and that which is expressly forbidden may lie in the generous interpretation of the term "emergency conditions." Such an interpretation significantly narrows the gap and alleviates the problem. The concept "emergency" is not restricted to Hurricane Agnes or the Blizzard of '88. The suddenness of onset, moreover, need not be its only hallmark. A glacier may pose an emergency as surely as does a tidal wave. If the efficient operation of the government of a county of over half a million persons is being compromised by a particular condition, who is to say that that may not plausibly be deemed an "emergency condition?"[3]

It is part of the wisdom of administrative law that it is for those who deal regularly with the application of Regulation 9.01 to make that call, provided only that the call be not arbitrary or capricious. There is good reason for deferring to the executive branch of government when it comes to its basic internal operations. We have found no appellate decision that has ever been called upon to deal with Regulation 9.01 of the Baltimore County Code. The PSAB, by contrast, deals with those regulations routinely. The line between mere necessity and emergency is not boldly marked, and judicial deference is due to those with professional experience in working regularly along that uncertain boundary line.

---

3. Although Judge Byrnes remained wedded to the meteorological conceptualization of "emergency conditions," he nonetheless noted the imperative nature of the transfer:

 Any reasonable supervisor would have recognized *the need to* remedy the situation and *take swift action, as did Mr. Adams.*

 . . . .

 [T]he end result was both reasonable and necessary. *Swift action was called for.*

 (Emphasis supplied).

### The Deference Due The Agency's Interpretation

■ The PSAB affirmed the decision of the Director of Public Works to transfer the appellant to another position in county government of comparable status and salary pursuant to §§ 25–9(b) and 25–126, Regulation 9.01 of the Baltimore County Code. In determining that the clearly established factual circumstances in this case fit within the provision of those two sections of the County Code, the PSAB was applying regulations promulgated to deal with personnel matters within the executive branch of Baltimore County government.

Whether, on the same evidence, we might have reached the same decision as did the PSAB is beside the point. Whether the PSAB's decision is looked upon as fact-finding or as an interpretation of the personnel regulations, the deference we owe to its ultimate determination was made very clear by Judge Eldridge in *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 68–69, 729 A.2d 376 (1999):

> "Despite some unfortunate language that has crept into a few of our opinions, *a 'court's task on review is not to " ' "substitute its judgment for the expertise of those persons who constitute the administrative agency," ' " ' "* United Parcel v. People's Counsel, supra,* 336 Md. at 576–77, 650 A.2d at 230, quoting *Bulluck v. Pelham Wood Apts., supra,* 283 Md. at 513, 390 A.2d at 1124. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, *an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Lussier v. Md. Racing Commission,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996), and cases there cited; *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989) ('The interpretation of a statute by those officials charged with administering the statute is . . . entitled to weight'). Furthermore, *the expertise of the agency in its own field should be respected.*

(Emphasis supplied). See also *Futoryan v. Baltimore,* 150 Md.App. 157, 169–71, 819 A.2d 1074 (2003); *Angelini v. Harford County,* 144 Md.App. 369, 373–74, 798 A.2d 26 (2002) ("The critical agency determination in this case was not a finding of fact. Neither was it a ruling of law in the more common sense, although it was more like the latter than like the former. *It was,* rather, *the agency's interpretation of a law or regulation with respect to which the agency has a special expertise. When such an interpretation is under review, judicial deference is called for.*") (Emphasis supplied).

In *Maryland Commission on Human Relations v. Bethlehem Steel,* 295 Md. 586, 592–93, 457 A.2d 1146 (1983), Judge Davidson explained for the Court of Appeals why agency interpretations of agency rules are deserving of such great deference.

> More important, agency rules are designed to serve the specific needs of the agency, are promulgated by the agency, and are utilized on a day-to-day basis by the agency.

See also *MTA v. King,* 369 Md. 274, 288–89, 799 A.2d 1246 (2002).

In *Marzullo v. Kahl,* 366 Md. 158, 173, 783 A.2d 169 (2001), Judge Cathell further explained why such deference by the courts is appropriate.

> In the case *sub judice,* the facts of the case are not in dispute; however, the Board of Appeals' interpretation and application of the BCZR is in dispute. As stated in *Banks, even though the decision of the Board of Appeals was based on the law, its expertise should be taken into consideration and its decision should be afforded appropriate deference* in our analysis of whether it was "premised upon an erroneous conclusion of law."

(Emphasis supplied).

In announcing that "an agency's interpretation of an administrative regulation is of controlling weight unless it is plainly erroneous or inconsistent with the regulation," *Ideal Federal v. Murphy,* 339 Md. 446, 461, 663 A.2d 1272 (1995), quoted

with approval from the Supreme Court's opinion in *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965):

"When faced with a problem of statutory construction, *this Court shows great deference to the interpretation given* the statute *by the officers or agency charged with its administration.*

\* \* \* \* \* \*

*When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.*"

(Emphasis supplied).

With respect to its affirmance of the decision of the Acting County Administrative Officer to transfer the appellant out of the Bureau of Building and Equipment Services, we cannot say that any of the findings of the PSAB were clearly erroneous or that its final determination was arbitrary or capricious.

### Erasing the "Red Circle"

■ Only at the outermost edge of the PSAB's determination do we venture to intervene. The final part of the PSAB's ruling was:

Lastly, the Board agrees with the County position that *this was not a disciplinary action,* therefore the concept of progressive discipline does not apply.

(Emphasis supplied).

With respect to the lateral transfer itself, the PSAB's ruling that the transfer was not a disciplinary action was neither arbitrary nor capricious. Whether we would have made such a ruling and whether Judge Byrnes would have made such a ruling are both, of course, beside the point. There was substantial evidence, to wit, the testimony of Edward J. Adams (if nothing else), to support that ruling. The transfer was to a position of equal classification and salary. Any unsought transfer, of course, might entail such annoying sequelae as a drabber view from one's office window, a longer walk from the parking lot, or a less commodious rest room, but the rise and fall of such amenities are not picked up on the

law's radar screen. More significantly, the transfer in this case produced none of the tell-tale stigmata of a § 25–15 disciplinary action. There was no dismissal from employment, no demotion, no suspension without pay.[4]

■ On the periphery of the appellant's transfer, however, there did appear one troubling side effect. After the appellant was transferred to the position of Management Assistant IV in the Department of Recreation and Parks, his new position was "red-circled." Although the appellant acknowledges that the "red-circling" entailed no immediate loss of pay or benefits, he claims (and the County does not deny) that it would have the future effect of freezing his salary at its present level and of denying him even cost of living adjustments (COLA's). No explanation has been offered for the "red circling."

Because the appellant had not been subjected to such a limitation or ceiling in his former position, we cannot escape the suspicion that the imposition of such a condition has some punitive connotation. Unlike the lateral transfer itself, it does not seem to have been necessitated by any emergency conditions.

Accordingly, we are going to remand the case to the Circuit Court for Baltimore County so that it may remand it to the Baltimore County Personnel and Salary Advisory Board. We further direct that, upon remand, the PSAB shall either 1) order the "red circle" around the appellant's new position to be removed or 2) require the County, should it desire to retain

---

4. It may, indeed, have worked to the appellant's ultimate advantage that the County chose not to follow the disciplinary route. Judge Byrnes noted that the appellant's "bad behavior far exceeded that of Ms. Spriggs, who [appellant] wanted to be demoted at a pay loss of $20,000 per year." Judge Byrnes further observed, "It is not farfetched to assume that if the proper procedures had been followed, [the appellant] may have been fired, rather then simply transferred." As it was, however, the appellant was neither fired nor subjected to a loss of pay.

Indeed, it would be exceedingly difficult to squeeze his transfer within the coverage of § 25–15, even if one concluded that its purpose were punitive. It was neither a dismissal from his job, a demotion, or a suspension without pay, and that is as far as the coverage of § 25–15 goes.

the "red circle," to justify that limiting condition by following the disciplinary procedures spelled out in § 25–15 of the County Code.[5] In all other respects, the judgment is affirmed.

**WITH RESPECT TO "RED CIRCLING" OF APPEL-LANT'S POSITION, CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; IN ALL OTHER RESPECTS, JUDGMENT AFFIRMED; COSTS TO BE DIVIDED EQUALLY BE-TWEEN APPELLANT AND APPELLEE.**

---

5. We hesitate in only one respect in presuming to direct the PSAB on remand. If conceivably, in some fashion beyond our knowledge, the practice of "red circling" a position or an employee serves some neutral purpose in County government and does not routinely engage the gears of § 25–15's disciplinary procedures, we think it should be incumbent on the County to explain, on the record, 1) why, generally speaking, "red circling" should not be considered punitive in nature; and 2) why, in the special circumstances of this case, it should not be deemed to have had, advertently or inadvertently, a punitive impact on this particular appellant.